S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**DONNA B. MADDUX, OSB #023757**
Assistant United States Attorney
donna.maddux@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for United States of America

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**RACHEL LEE,**<br><br>Defendant. | No. 3:14-CR-00184(1)-JO<br><br>**GOVERNMENT'S MOTION FOR REVIEW AND REVOCATION OF RELEASE ORDER** |

The United States of America, by S. Amanda Marshall, United States Attorney for the District of Oregon, through Donna Brecker Maddux, Assistant United States Attorney for the District of Oregon, moves this court to revoke the release order issued by the Honorable Paul Papak on June 18, 2014 pursuant to 18 U.S.C. § 3145(a).  Defense counsel objects to this motion.

    **I.**    **Status of the Case**

On May 7, 2014, the grand jury returned a thirteen count indictment charging defendant with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, eleven

counts of money laundering in violation of 18 U.S.C. § 1957, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  Defendant Rachel Lee is the first named defendant in this four-defendant indictment and the only defendant charged in all counts.

Due to concerns regarding the safety of the victim and the possibly of flight by the defendant with the victim under her control, federal agents arrested the defendant in Bend, Oregon, the morning after the grand jury returned the indictment.

Defendant appeared in federal court before Magistrate Judge Dennis J. Hubel on May, 9, 2014.  At that time, after a lengthy oral presentation by the government, Magistrate Judge Hubel detained the defendant based on the serious risk that defendant would flee and the serious risk that defendant would obstruct or attempt to obstruct justice, threaten, injure, or intimidate a prospective witness or attempt to do so.

On June 18, 2014, the defendant appeared before Magistrate Judge Paul Papak for a review of detention at the request of defense counsel.  Magistrate Judge Papak ordered the defendant released to a community corrections center pending a pre-trial services investigation of placement and supervision options.

## II.     The Release Order Should be Reviewed Because the Victim Was Not Afforded the Right to Notice of the Release Hearing and the Right to be Heard as to Release of the Accused

Neither the victim nor the victim's legal representative received notice of the June 18, 2014 release hearing.  Crime victims' enforceable rights include (in relevant part):

(1) The right to be reasonably protected from the accused.
(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole hearing, involving the crime or of any release or escape of the accused.
(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

18 U.S.C. § 3771.

The government is in communication with counsel for the victim, attorney Kit Jensen. Mr. Jensen told government counsel that he did not receive notice of the June 18th detention hearing, he objects to defendant's release on behalf of his client, and he wishes to be heard at any release hearing involving defendant Rachel Lee.

As authorized by 18 U.S.C. § 3771(d)(1), the government hereby asserts the right of the victim in this case to notice of any release hearing and to be heard on matters involving release. The relief sought for violation of the victim's right to notice and to be heard at the June 18th release hearing is the opportunity for the victim's legal representative to be heard on the matter of release at the time set for the hearing on this motion.

> **III.    The Court Should Revoke the Release Order as Defendant Represents a Flight Risk, There is a Serious Risk the Defendant Will Obstruct Justice, or Threaten, Injure, or Intimidate the Victim or Other Witnesses, and There are No Conditions that Would Reasonably Assure the Defendant's Appearance**

A.    <u>Legal Standard</u>

Under the Bail Reform Act, a judicial officer shall detain a defendant pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B).

A *de novo* standard of review, not a deferential standard, is applied to a district court's review of a magistrate's bail order. *United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990) ("[the district court] should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference").

In determining whether "there are any conditions of release that will reasonably assure the appearance of the person as required," the court should consider four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against defendant; (3) the history and characteristics of defendant; (4) and the nature and seriousness of the danger posed by defendant's release. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

1. *Nature and Circumstance of the Offense Charged*

The nature and circumstances of the offense charged are extraordinary and egregious. Evidence developed during the investigation of this matter establishes that Rachel Lee met the victim (hereinafter Jr.) in approximately 2004 and quickly targeted him based on his financial and real estate assets and his vulnerability. Her active theft from Jr. continued until the day of her arrest, but according to Jr.'s counsel, her influence and control over the victim potentially continues to this day.

Like other "sweetheart swindles," the evidence shows Rachel Lee built a false trust relationship with Jr. based on elaborate lies, established her role as caretaker, isolated Jr. from others, took complete control of his assets, and systematically drained millions of dollars from his bank accounts without Jr.'s knowledge or consent. Financial records show that, at a minimum, Rachel Lee and her coconspirators stole $12.3 million dollars from Jr. As the

investigation continues, the theft amount grows and the government now believes the loss could reach as high as $20 million.

While spending Jr.'s millions, through repeated lies and strategic manipulation, Rachel Lee convinced Jr. that he was nearly broke. Rachel Lee and her coconspirator Porsha Lee, in character as Jr.'s "wife" Mary Marks, negotiated the sale of Jr.'s 1200 acre family tree farm. Rachel Lee and Porsha Lee/Mary Marks persuaded Jr. that he needed to sell the property in order to pay for outstanding tax obligations that did not exist.

In January of this year, Rachel Lee arranged for Jr.'s last two residences and family properties to be sold without Jr.'s knowledge and consent. At the time of Rachel Lee's arrest, Jr. held slightly over $200,000 in accounts in his name.

At the time that Rachel Lee first met Jr., he was a lonely, socially challenged man in his 50's – never married, with no siblings and few friends. Rachel Lee exploited his vulnerability and created a false world for Jr. – one that included a fake wife, a fake child, and a belief that Rachel Lee acted on his behalf and in his best interest. Rachel Lee assumed power of attorney for Jr. and became the beneficiary of his will.

Rachel Lee caused Jr. to become completely dependent on her. Rachel Lee's arrest left Jr. with no active support structure and an inability to manage his own financial affairs. Because Jr. is a Navy veteran, the Oregon Department of Veteran Affairs assisted with the establishment of a conservatorship for Jr.'s benefit.

2. *The Weight of the Evidence Against Defendant*

The weight of the evidence against this defendant is overwhelming. The documentary evidence in this case shows that Rachel Lee was the principle architect and director of this crime.

Witnesses including Jr.'s family members, neighbors, past attorney, relator and others all support the allegations of fraud in the indictment.

   3. *The History and Characteristics of the Defendant*

The history and characteristics of this defendant support detention. Although the defendant does not appear to have a prior criminal history, she does have two separate identities. Case agents discovered two California drivers' licenses; one in the name of Rachel Lee and one in the name of Nicky Lamay.

The conduct alleged in the indictment is not an isolated incident for Rachel Lee – either for her or her close family members. The government has identified a second victim of Rachel Lee, N.J. N.J. met Rachel Lee through the Canby Psychic Shop earlier this year. Similar to Jr. in many ways, N.J. is a man in his sixties, lonely and socially isolated, and the owner of forested property worth approximately four million dollars. According to N.J., Rachel Lee quickly ingratiated herself with N.J. through lies and deceit, and as with Jr., recruited one of her daughters to assist with the building of trust. Within nine weeks of meeting Rachel Lee, N.J. purchased rings for their alleged impending marriage. Rachel Lee persuaded N.J., a janitor at a school, to lease a $120,000 Mercedes for her personal use. N.J. and others report that Rachel Lee wanted N.J. to sell his property, purportedly so they could move to Hood River together.

Rachel Lee's sister, Ruby Lee (aka Miller and Marks) committed a nearly identical crime in terms of process, if not profit. According to court records, in 2002 Ruby Lee followed a man in his eighties home from a grocery store, allegedly to return a dollar he dropped. Within weeks, she moved in with him as his caretaker. Under the guise of assisting him, Ruby Lee took control of the victim's finances. Between 2002 and 2008, Ruby Lee drained all his accounts, sold his home and all his belongings inside the home. In January of 2008, detectives discovered

the victim's accounts held just over five-hundred dollars. After her conviction, the Sacramento County Court sentenced Ruby Lee to serve a sentence of eight years. Released from prison in 2011, Ruby Lee now operates Psychic Shops in Salem and St. Helen's, Oregon. Rachel Lee's name also appears on billing paperwork related to the St. Helen's Psychic shop.

4. *The Nature and Seriousness of the Danger Posed by Defendant's Release*

   a. Risk of Flight

Upon conviction, Rachel Lee's guideline exposure is very high, and therefore her incentive to flee is also high. Given the amount of loss and possible enhancements for organizer/leader, abuse of position of trust, vulnerable victim, and interference with an investigation, Rachel Lee's offense level could reach as high as 37. Assuming no criminal history, the advisory guideline range could be 210-262 months imprisonment. As the government previously indicated at the first detention hearing, the government will seek the maximum sentence for this defendant.

More importantly, millions of dollars stolen from Jr. are still unaccounted for. Based on the investigation to date, defendant Rachel Lee is the only defendant with full access to the money stolen from Jr. The investigation determined that Rachel Lee gave at least one (1) million dollars and records to family members to "hold" for her, in accounts and safety deposit boxes in the names of family members. Those funds are available to Rachel Lee if she is released.

The circumstances surrounding Rachel Lee's arrest suggest she was in the process of fleeing with the victim. The day prior to the arrest, Internal Revenue Service, Criminal Investigations (IRS-CI) agents observed Rachel Lee and Jr. emerge from a bank in Bend, Oregon, with a large envelope. Once IRS-CI agents entered defendant's Psychic Shop and

residence, they found suitcases packed for a trip at the door and disposable phones, as opposed to the iPhones the defendants typically carried. The agents also located $36,400 on the person of co-defendant Porsha Lee, stored in her underwear. Agents found Jr. in a separate apartment behind the Psychic Shop, disoriented and disheveled, without access to car keys or his phone or knowledge of the location of those items. Jr. later claimed that Rachel and Porsha Lee planned to take him on a road trip out of state.

Finally, the defendant Rachel Lee no longer has any ties to the community.

b. <u>Risk of Obstruction or Interference with or Intimidation of a Witness</u>

The risk of obstruction or interference with the victim in this case is high, as evidenced by the fact that Rachel Lee already obstructed or attempted to obstruct justice by influencing or intimidating prospective witnesses – namely Jr., the victim and central witness in this case.

On March 19, 2014, agents first met with Jr. At that time, Jr. asserted that he had only allowed Rachel Lee to access his accounts for the purpose of covering regular expenses, that he believed the most he had in his accounts at any one time was about $2 million dollars, and that he had paid a large amount to cover taxes. Jr. also claimed he had a son and was married to the mother of his son, a woman named Mary Marks.

On March 21, 2014, IRS-CI and local law enforcement officers executed search and seizure warrants at the Canby Psychic shop and seized approximately two million dollars in bank accounts in Rachel Lee's name, along with a Ferrari purchased with Jr.'s money in the name of codefendant Blancey Lee.

On April 25, 2014, government agents met with Jr. at Jr.'s request. Jr.'s then-attorney, Brett Hall, accompanied him to the meeting. Rachel Lee's then-attorney, Adam Dean, arranged for Brett Hall to represent Jr. Dean and Hall share office space.

While the government raised concerns about the nature of this representation, the interview took place on April 25th at the U.S. Attorney's office.  At that time, Jr. told agents that Rachel had "explained things" and had "cleared things up," while at the same time reporting that he had limited contact with Rachel Lee since his first contact with agents.  In a scripted and prepared manner, Jr. reported he "gifted" Rachel Lee four million dollars, was not married and did not have a child.  Once confronted with evidence that Rachel Lee spent well in excess of four million dollars of Jr.'s money without his knowledge, Jr. stated "I think we have a problem here" and relayed that he felt foolish and would later "demand more accountability" from Rachel, as she still controlled all his finances.  The following week, Hall reported to the government that Jr. did not return his calls.  IRS-CI located Jr. with Rachel Lee heading towards Bend, Oregon.  Within days, the government arrested Rachel Lee on the current charges.

Rachel Lee attempted to obstruct justice by providing Jr. with a scripted story to tell the government in an attempt to make her theft appear consensual.   Rachel Lee also obstructed justice by taking the victim out of reach of investigators during the pendency of the investigation and, at the very least, attempting to take the victim out of state.  Where evidence exists of prior obstruction and manipulation of witnesses, it is reasonable for the court to infer that a no-contact order is insufficient to insure the safety of that witness and the administration of justice.  *United States v. Delker*, 747 F.2d 1390, 1401 (3rd Cir. 1985).

## IV.    Conclusion

Because the victim was not afforded notice and a hearing on release issues, the release order of June 18, 2014 should be reviewed.  There is sufficient evidence for the Court to find that 1) there is a serious risk that defendant would flee and 2) there is a serious risk that defendant would obstruct or attempt to obstruct justice, threaten, injure, or intimidate a prospective witness

or attempt to do so. For these reasons, the defendant's pre-trial release order should be revoked and, consistent with the original order by Magistrate Judge Hubel, the defendant should remain in detention pending trial.

DATED this 20th day of June, 2014.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

*/s/ Donna Maddux*
DONNA BRECKER MADDUX
Assistant United States Attorney