S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**DONNA BRECKER MADDUX, OSB #023757**
Assistant United States Attorney
Donna.Maddux@usdoj.gov
**ANNEMARIE SGARLATA, OSB #065061**
Assistant United States Attorney
AnneMarie.Sgarlata@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:14-CR-00184-JO-01 |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| RACHEL LEE, | |
| Defendant. | |

The United States of America, by and through S. Amanda Marshall, United States

Attorney for the District of Oregon, Assistant United States Attorney Donna Brecker Maddux,

and Assistant United States Attorney AnneMarie Sgarlata, hereby files its sentencing

memorandum in the above-captioned case.

///

///

///

///

## TABLE OF CONTENTS

I.    SENTENCING RECCOMENDATION ........................................................................4

II.   STATUS OF CASE .............................................................................................4

III.  STATEMENT OF FACTS ......................................................................................5

    A.  The Victims: Jr., Sr., and the Raines Tree Farm LLC ............................................6

        1.  Sr. and the Raines Tree Farm ................................................................6

        2.  Jr. .........................................................................................................8

    B.  The Fraud Scheme .................................................................................................9

        1.  October 2006:  Rachel Lee Becomes Care Worker for Sr. .....................11

        2.  2007: Porsha Lee is Introduced as Mary Marks ....................................13

            a.  The British Citizen Story: Facilitating the Fraud ..........................15

            b.  The Real Person Behind the Mary Marks Name ...........................16

            c.  Rationale for Use of the Name "Mary Marks" in the
                Fraud Scheme ..............................................................................17

            d.  Mary Marks as Bookkeeper ..........................................................18

            e.  CPA Records .................................................................................18

            f.  Mary Marks Raines Tree Farm American Express Cards ............20

            g.  Mary Marks and Birkendene Ownership .......................................20

            h.  Mary Marks as the Mother of Jr.'s Child Giorgio ........................20

        3.  Rachel Lee, Porsha Lee, and Other Family Members Conspired to
           Maintain the Mary Marks persona:  Evidence from Search Warrant .....22

        4.  2007 – 2011: Rachel Lee Establishes Legal Control Over Jr. ...............23

            a.  Durable Power of Attorney: March 2008 .....................................24

            b.  Rachel Lee and Mary Marks as Beneficiaries of Jr.'s Will:
                December 2010 ............................................................................25

        5.  Rachel Lee as Sr.'s Caregiver: Early 2007 – Early 2011 ......................26

            a.  Quality of Care ..............................................................................26

            b.  Rachel Lee Uses Raines' Money to Pay Others to Care for Sr. ....28

            c.  From the A-frame to Birkendene ..................................................29

        6.  Sr. Passes: February 2011 ....................................................................31

        7.  2007 – 2011:  Investment Liquidations .................................................32

        8.  2011 – 2012: The Tree Farm Sales .......................................................33

            a.  Gloria ...........................................................................................35

            b.  Last Properties ..............................................................................36

            c.  Rachel Lee Sold the Tree Farm Properties Knowing the Sale
                Would Generate Tax Liabilities for Jr. .........................................36

        9.  Rachel Lee Handled All Tax and Bookkeeping Matters on Behalf
           of the Tree Farm after Sr.'s Stoke ........................................................38

        10. Rachel Lee's Taxes ..............................................................................39

11. Rachel Lee's Financial Control of Jr. and Bank Accounts ....................39
    a.  2007....................................................................................................40
    b.  2008....................................................................................................40
    c.  2009....................................................................................................41
    d.  2010 and 2011 .................................................................................42
    e.  2012....................................................................................................42
12. Rachel Lee's Control of the Raines Tree Farm American
    Express Card .........................................................................................43
13. Jr.'s Signature on a Document or Presence at a Transaction Does Not
    Negate Rachel Lee's Fraud .................................................................43
C. The Money Laundering Scheme: Spending the Proceeds of the Fraud ..............45
    1. Luxury Clothing and Jewelry ...........................................................45
    2. Luxury Vehicles ................................................................................46
    3. Travel .................................................................................................48
    4. Real Property .....................................................................................48
D. The Investigation ...................................................................................50
E. Assets under Jr.'s control at the end of the Scheme ..............................53

IV.    THE GOVERNMENT'S SENTENCING GUIDELINE CALCULATION ...................53
V.    THE APPROPRIATE STANDARD OF PROOF ....................................................55
VI.    THE USE OF HEARSAY AND OTHER ADMISSIBLE EVIDENCE .........................57
VII.    ADJUSTMENTS ..................................................................................................57
A. Aggravating Role in the Offense ..........................................................57
B. Abuse of Position of Trust ...................................................................61
C. Obstruction of Justice ..........................................................................62
VIII.    § 3553(a) FACTORS .........................................................................................64
A. Nature and Circumstances of the Offense ............................................66
B. History and Characteristics of the Defendant ......................................66
    1. Financial Exploitation of B.T. ..........................................................66
    2. Financial Exploitation of N.J. ...........................................................67
    3. Financial Exploitation: Similar Crime ..............................................68
C. A Below Guidelines Sentence of 108 Months Promotes Respect for the Law,
    Provides Just Punishment for the Offense, and Supports General and Specific
    Deterrence ...............................................................................................69
IX.    FORFEITURE AND RESTITUTION .....................................................................70
A. Forfeiture ..............................................................................................71
B. Restitution: Request for Separate Restitution Hearing for
    All Three Codefendants .........................................................................71
X.    CONCLUSION ....................................................................................................75

## I.     SENTENCING RECCOMENDATION

The government concurs with the U.S. Probation Office and recommends a sentence of 108 months in prison, a three-year term of supervised release, restitution in the amount of $15,490,978.65 and a special assessment of $225.

## II.     STATUS OF THE CASE

On May 7, 2014, the grand jury returned a thirteen count indictment charging defendant with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, eleven counts of money laundering in violation of 18 U.S.C. § 1957, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  Defendant Rachel Lee is the first named defendant in this four-defendant indictment and the only defendant charged in all counts.

Due to concerns regarding the safety of the victim and the possibility of flight by the defendant with the victim under her control, federal agents arrested the defendant in Bend, Oregon; the morning after the grand jury returned the indictment.

Defendant appeared in federal court before Magistrate Judge Dennis J. Hubel on May, 9, 2014.  After a lengthy oral presentation by the government, Magistrate Judge Hubel detained the defendant based on the serious risk of flight by defendant.

On June 18, 2014, the defendant appeared before Magistrate Judge Paul Papak for a review of detention at the request of defense counsel.  Magistrate Judge Papak ordered the defendant released to a community corrections center pending a pre-trial services investigation of placement and supervision options.

On June 30, 2014, the defendant appeared before District Court Judge Robert E. Jones for a hearing on the government's motion for review and revocation of the release order entered by Magistrate Judge Papak.  On July 1, 2014, in a written opinion, Judge Robert E. Jones granted

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 4**

the government's motion to revoke defendant's pretrial release based on defendant's serious risk of flight.

On September 30, 2014, the grand jury returned a superseding indictment, charging defendant with an additional three counts (Counts 14-16) alleging criminal failure to file individual tax returns for tax years 2009, 2010, and 2011 in violation of 26 U.S.C. § 7203.

The Court scheduled trial for all four defendants beginning on October 27, 2014.  Based on co-defendants' motions for continuance and severance, the court severed the trials of co-defendants Porsha Lee and Blancey Lee.  The Court denied the government's motion for a continuance of Rachel Lee's trial date and retained the originally scheduled October 27, 2014 trial date.

On October 14, 2014, pursuant to a plea agreement, defendant pleaded guilty to counts 1, 13, and 14 of the superseding indictment.  The Court dismissed the remaining counts of the superseding indictment based on the motion of the government.   The Court originally scheduled sentencing for January 20, 2015.   Based on a request from the United States Probation Officer, the Court rescheduled the hearing and set sentencing for February 19, 2015 at 9:30 a.m.

## III.    STATEMENT OF FACTS

In September of 2003, Rachel Lee moved to Oregon from California to live with Blancey Lee as a couple.  At the time, Rachel Lee and Blancey Lee lived in Bend, Oregon.  They rented a dual-purpose residence in Bend.  Rachel Lee met with clients in the area she utilized as a Psychic Shop and the couple made their home in the associated living quarters.  They lived modestly, primarily on the income Rachel Lee generated from Psychic Shop clients.  Despite their shared last name, Blancey Lee and Rachel Lee never legally married and are not otherwise closely related.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 5**

None of Rachel Lee's five children from her previous marriage initially came with her to Oregon.   Four of Rachel Lee's five children eventually joined her in Oregon:  Porsha Lee, Samantha Lee, Pebbles Lee, and Timothy Lee.  With the exception of Rachel Lee's eldest daughter Krystal Lee, each of the defendant's children lived with Rachel Lee from time to time during the duration of the charged conduct.

Sometime in 2004, defendant Rachel Lee met the primary victim in this case, Ralph Raines Jr. (herein Jr.), when Jr. visited the defendant's Psychic Shop in Bend.  During the investigation, Jr. admitted a lifelong interest in the paranormal and the psychic realm.  Jr. told investigators that throughout his life he had "been to as many psychic readers as you've been to shoe stores."

### A.  The Victims: Jr., Sr., and the Raines Tree Farm LLC

At the time Jr. met Rachel Lee in 2004, he was approximately 57 years old.  Jr. never married, never fathered children, and lived the majority of his adult life alone in a dilapidated old home on the Raines Tree Farm in Gaston, Oregon.   In 2004, and for most of his adult life, Jr. worked with for his father, Ralph Raines Sr. (herein after Sr.) on the Raines Tree Farm.

### Sr. and the Raines Tree Farm

Sr. graduated from Forest Grove high school in 1938.  He served one enlistment in the United States Army Air Force during World War II.  According to Hank Scott, Sr. served as flight navigator in a Liberator bomber.  During the war, Sr. earned a Distinguished Flying Cross. In 1946, after Sr. returned from the Army, he married Helen Doppleb Raines.  Helen gave birth to their only child, Jr., in 1947.

Sr. acquired a partial interest in his father's saw mill in Forest Grove, Oregon.  In the mid-1950's, Sr. used the proceeds of that partial interest to purchase approximately 1,000 acres

of property in rural Gaston from the Lee family (no relation to defendants).  Over the span of fifty years, Sr. and Jr. developed this property into the Raines Tree Farm.

The 1,000 acres were not fully forested at the time of purchase.  Sr. and Ralph personally planted thousands of trees on the property over the life of the Raines Tree Farm.   The Raines Tree Farm operated as a sustained yield timber farm, generating timber income from commercial thinning only, not clear cut operations.   Tree Farm Certified Public Accountant (CPA) Russ Ries described the Tree Farm as more of a conservation effort than a commercial endeavor.

Local loggers contracted with the Tree Farm, through Sr., to log certain specified timber amounts each year.  The loggers sold the timber to mills for import or export, with sales profits split between the logger and the Tree Farm.

In 1972, Sr. built a wooden A-frame home on the Tree Farm property.  Sr. and his wife moved to this remote location, high on a hill at the end of a gravel road.  From the home, Sr. looked out over his property and the forest he built.

Early Raines Tree Farm signs read "Growing a Forest Forever" and reflect Sr.'s intent to operate and maintain the Tree Farm as a continuous resource.  (Ex. 70)  In later years, visitors to the property observed nearly 1,200 acres of rich and protected forest.   Abundant in wildlife and natural features, Sr. allowed friends and neighbors to hunt, hike, and ride horses throughout the expansive property.

Sr. exercised full and complete control of the operational and financial aspects of the Tree Farm until he suffered a stroke in 2006.  Sr. engaged an attorney, Michael Moore of Forest Grove, and an accounting firm to assist with the legal and financial aspects of the business.  With Michael Moore's assistance, Sr. established Raines Tree Farm LLC in 1998. (Ex. 1).  Sr. owned the controlling interest in Raines Tree Farm LLC until his death in 2011.  After Sr.'s death, full

ownership passed to Jr.   A skilled business person, in addition to his Tree Farm holdings, Sr. amassed investments in excess of five million dollars.

Over the course of the charged conduct, Rachel Lee drained all of Sr. and Jr.'s investments and sold the Raines Tree Farm for her own benefit.  In addition to the financial devastation caused by this fraud scheme, the forest the Raines' built no longer stands.  Today, visitors to the property find a clear cut where the Raines Tree Farm once thrived.

**Jr.**

As a child, Jr. had few friends and struggled with social interactions and group sports. After graduating from Forest Grove high school, Jr. entered the Navy and served in Vietnam. After his return from active military service, Jr. remained in the Naval Reserve.  Jr. completed college courses in a forestry program and returned to Gaston to work with his father on the Tree Farm.

At the Tree Farm, Jr. did not live in the A-frame home with his parents.  Instead, Jr. lived alone for years in the "old Lee house" – a home built by the original owners of the property, just down the gravel road from the A-frame.   Family members and individuals familiar with the Lee house describe it as being in state of structural disrepair with limited access to heat, water and electricity.   Sometime after Jr.'s mother died in 2001, Jr. moved into the A-frame with his father.

Jr. played no role in the business operations of the Tree Farm.  He spent the majority of his time out in the Tree Farm – planting and tending to his beloved trees.   Outside of the tree farm, Jr.'s clothes often bore the green and brown marks of his work on the land.

For his labor, Sr. paid Jr. a small monthly stipend which covered his minor living expenses.  Friends and family describe Jr. as a simple farmer with few material needs.  When

asked by investigators about his spending habits, Jr. reported a preference for shopping at WalMart and Goodwill.

Jr. is described by friends and family as bright, but socially inept, gullible and naïve. Jr.'s personal traits and his life and work history made Jr. the perfect victim for Rachel Lee's fraud scheme.

## B. The Fraud Scheme

### The Early Years: 2004 – October 2006

After Jr.'s initial meeting with Rachel Lee in 2004, the two continued to communicate. Jr. shared the details of his life and his best kept secrets with Rachel Lee. Rachel Lee learned personal information about Jr. and about his family investments and business. Armed with this information, Rachel Lee carefully crafted a false history for the purpose of gaining sympathy from Jr. and building trust with him.

Rachel Lee claimed to be a widow with one child from her previous marriage. Jr. reports that Rachel Lee also said her parents died. This fact caused Jr. to feel a kinship with Rachel Lee as his mother died three years prior.

Rachel Lee claimed her husband died from cancer and that she provided care for him in his sick and dying days. Finally, she claimed that prior to her husband's death, he owned a car repair shop and she assisted with the bookkeeping for the business. These lies laid the groundwork for Rachel Lee becoming Sr.'s caretaker and taking control of the Raines personal and business accounts. With this false back story in place, Rachel Lee began the long grooming process that eventually led to Jr.'s full trust and dependence on her, allowing her to exercise undue influence and extract his entire family fortune from him.

Between 2004 and late 2006, Rachel Lee sought and Jr. provided her with escalating amounts of money and items of value.  For example, witnesses report that Jr. purchased Rachel Lee a Hummer during this period.  It is unclear exactly why Jr. paid Rachel Lee throughout this time frame, but it appears that Jr. believed that Rachel Lee's psychic abilities could assist him.

On February 14, 2006, Jr. purchased a beautiful new construction home for Rachel Lee in the West Hills of Portland for $915,000.00. (Ex. 2)  The 4,601 square feet home featured four bedrooms, three and a half bathrooms, a den, a master suite with his and her closets, a fireplace, and a dual shower, and high-end upgrades and appliances throughout.  At approximately 59 years old, this was Jr.'s first real estate purchase.

Rachel Lee talked Jr. into purchasing this home, in part, by convincing him that he would realize investment gains as a result of the purchase.  Jr. stated that Rachel Lee claimed prior work history in the real estate industry, and therefore he trusted her advice regarding the investment potential of the home.

Jr. permitted Rachel to handle all the details of the purchase.  Rachel Lee signed for Jr. on some of the purchase related documents. (Ex. 3)  Rachel Lee furnished and decorated the home with Jr.'s money.   Rachel Lee, Blancey Lee and a changing landscape of their children, grandchildren, and other family members lived in the home and occupied the four bedrooms from 2006 until they sold the home in 2012.  Jr. visited, but never lived in this house.   Later, Rachel Lee moved Sr. into this home, but Sr. never occupied one of the many bedrooms.

Witnesses report that during the early years, Rachel Lee and Jr. presented as a couple. Jr.'s cousin, school classmate, and lifelong friend Karen Fenimore recalls Jr. and Rachel Lee coming to her home to announce their engagement.  Fenimore recalls Jr. and Rachel Lee with their arms around each other and behaving as if they were a couple.  Ted Sahlfield, also related

to Jr., recalls meeting Rachel Lee two or three times.  During one of those meetings, Jr. and Rachel Lee came to Sahlfield's home and announced their plans to marry.

CPA Ries recalls Jr. initially introducing Rachel Lee to Ries as Jr.'s girlfriend.  Later, in 2011 or 2012, Columbia Bank employee Heather Dollarhyde recalled Rachel Lee coming into the branch and telling employees that she and Jr. were engaged.  Any plans that existed for Jr. and Rachel Lee to marry evaporated once Rachel Lee arranged a meeting between Jr. and the woman he came to know as Mary Marks.  That meeting occurred sometime after 2006.

Jr. met Blancey Lee sometime between 2004 and 2006.  Jr. reported knowing Blancey Lee only as Rachel Lee's on-again-off-again boyfriend.  When Sr. fell ill, at Rachel Lee's direction, Jr. hired Blancey Lee to perform work on the A-frame.  Blancey Lee allegedly worked as a general contractor.  The work on the A-frame included improvements to the front and back decks, a handicap accessible bathtub, and rails.  Jr. also recalls paying Blancey Lee for help planting trees on the Tree Farm.  Jr. reports he never provided Blancey Lee with a debit card, a credit card, or any access to Tree Farm or personal accounts.  Jr. described his relationship with Blancey Lee as "strictly business."

**October 2006:  Rachel Lee Becomes Care Worker for Sr.**

In October of 2006, Sr. suffered a stroke and his health declined.  At this time, Sr. still lived in the A-frame and ran the Tree Farm business.  Sr.'s declining health presented Jr. with two challenges – Sr.'s ongoing physical care and the running of the Tree Farm business without Sr.'s oversight.  Jr. needed to make important decisions regarding his father's care and the Tree Farm.  Friends and family members report that Jr. often struggled with even simple decision making.  At this time of crisis, Jr. turned to the person he trusted most in the world - Rachel Lee.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 11**

After two years of cultivating Jr. and building trust, Sr.'s stroke opened a new and dangerous door in the ongoing fraud scheme orchestrated by Rachel Lee.

Jr. wanted to keep Sr. at home in the A-frame. Neighbor and longtime friend to Sr. and Jr., Ethel Kelly, offered her assistance. Kelly lived close by, had her own key to the A-frame, cleaned the home for Sr. at his request, and previously worked in nursing. Despite that, Jr. hired Rachel Lee to serve as his father's home care worker. Jr. justified his hiring of Rachel Lee in part based on Rachel Lee's false claim that she provided cared for her dying husband. Jr. hired Rachel Lee to provide caretaking, cleaning, cooking, laundry, and errand running 24 hours a day, seven days a week. For this work, Jr. agreed to pay her $8,985 per month. To facilitate her duties, Jr. gave Rachel Lee a debit card and authority to use the card for reasonable expenses for herself, Jr. and Sr.

Jr. also needed help running the business and handling the books. According to Jr. and CPA Russ Ries, Rachel Lee offered to manage the business and personal accounts for the benefit of Jr. and Sr. Trusting Rachel Lee to act in his best interest, Jr. turned over all account control and management to her. Jr. believed Rachel Lee's representations that she consistently acted in his personal and financial best interest. He never independently reviewed bank statements or transaction histories.

At Rachel Lee's direction, Jr. wrote and signed checks, transferred large sums, and purchased vehicles and real estate without full or accurate knowledge of the nature of the transactions. If Jr. knew about an expense, Jr. believed every explanation or justification Rachel Lee provided without question. The investigation reveals Jr. never fully understood the nature of the transactions he participated in with Rachel Lee.

**GOVERNMENT'S SENTENCING MEMORANDUM** **Page 12**

**2007: Porsha Lee is Introduced as Mary Marks**

In 2007, Rachel Lee recruited her daughter Porsha Lee to play a critical role in this fraud. Together, Rachel Lee and Porsha Lee created a character – a fake persona to introduce to Jr. They named this character Mary Marks.   They created the Mary Marks character to appeal to Jr.'s physical preferences for blond and light skinned women.  Rachel Lee and Porsha Lee carefully crafted Mary Marks' false history to maximize their potential to exert influence over Jr. and steal his family fortune.

On August 26, 2014, three months after Rachel Lee's arrest, Jr. relayed to investigators a detailed memory of the evening he met the woman he came to know as his wife and the mother of his child.  It should be noted that Jr.'s memory of certain events over the life of the fraud scheme is clouded.  Jr.'s friends and family report, over the years, Jr. relayed multiple and contradictory accounts of the first time he met Mary Marks.  Jr. also related conflicting information to agents over the course of this investigation.  During the August 26th interview, Jr. acknowledged difficulty with short term memory, particularly with events between 2011 and the present.  Jr. further reported that his doctors expressed concerned about his short term memory loss issues.  However, Jr. reported he trusted his long term memory.  The account Jr. relayed to investigators as follows is consistent with other facts developed during the investigation.

Jr. recalls meeting Mary Marks for the first time on October 21, 2007.   After returning from a tree farm convention, Jr. called Rachel Lee from the Portland airport for a ride home. Rachel Lee instructed Jr. to wait for her in the smoking area outside.  While sitting on a bench in the smoking area, Jr. noticed a woman sit down on the other end of the bench.   This woman had long blond hair, and wore glasses and a hat.  In a distinct British accent, the woman asked if Jr.'s name was Ralph.  He responded yes and asked how she knew his name.  She responded that she

**GOVERNMENT'S SENTENCING MEMORANDUM**                                      **Page 13**

wasn't a psychic reader by trade, but she could read some people.  She continued to "read" him, and told him personal information about himself, including his birthdate and information about his mother.  Porsha Lee, in character as her fake persona, used information provided to her by her mother to connect with Jr. and began to build rapport with him.

The woman introduced herself as Mary Marks.  Lee/Marks claimed to be in town to visit her brother and her clients.  Lee/Marks stated she worked as a roving QuickBooks keeper but lived in California in the San Francisco Bay area.  The two exchanged contact information and made plans to meet later that week for coffee.

When Rachel Lee arrived at the airport take Jr. home, he made no mention of the woman he met.   Eventually, he told Rachel Lee about Mary Marks and introduced the two women.  Throughout the fraud scheme, Rachel Lee and Porsha Lee/Mary Marks maintained – and Jr. believed - that the two women met as a result of their connection to Jr. and did not otherwise know each other.

Porsha Lee as Mary Marks communicated with Jr., met with him, and cultivated a relationship with him.   In additional to the allure of companionship, two components of Lee/Marks' persona significantly facilitated the fraud and bent Jr. to the defendants' will – her alleged work experience and her citizenship status.

Jr. believes Lee/Marks suggested a role for herself in managing Jr.'s books along with Rachel Lee.  Jr. agreed.   As a "roving QuickBooks keeper," Lee/Marks could assist Rachel Lee with Jr.'s books and records, but Lee/Marks could not be engaged or present full time.   From that time on, Jr. believed that Lee/Marks and Rachel Lee worked together to manage Jr.'s finances for his benefit.  Jr. also falsely believed that with both women managing his finances, the two provided a check on each other's activities.

**GOVERNMENT'S SENTENCING MEMORANDUM**                              **Page 14**

### *The British Citizen Story: Facilitating the Fraud*

Lee/Marks claimed to be British citizen.  She claimed she needed help securing a green card to remain in the United States.   The false green card story facilitated the fraud scheme in multiple ways.

First, it may have served as a means to extract money from Jr.  For example, Jr. told others, including Karen Fennimore, that he paid for Lee/Marks to return to England for six months and to apply for a green card so Lee/Marks could avoid deportation.  During an interview with agents on September 8, 2014, Jr. recalled Lee/Marks returning to England to work with an attorney on her citizenship issues, but did not recall paying for the resolution of Lee/Mark's immigration issues.  Jr. did state that Rachel Lee may have accessed accounts for Lee/Marks' benefit without his knowledge.

Second, the green card story supplied a reason to encourage a marriage of convenience between Marks and Jr.  Porsha Lee/Mary Marks told Jr. the two needed to elope so she could avoid deportation.   According to Jr., one year in May, Lee/Marks directed Jr. to go to the Canby Psychic Shop so he and Marks could be married.  Lee/Marks told Jr. she could not be there, but Rachel Lee would meet him there.   Jr. reports that Rachel Lee directed him to sign paperwork consistent with Lee/Marks directions.   Jr. signed the documents at Rachel Lee and Lee/Marks direction.   They informed Jr. that by signing the paperwork, he and Marks were officially married.   Jr. provided conflicting statements about what year the two married.  However, the investigation revealed that the marriage occurred sometime after the birth of their purported child in late 2008 but before August of 2010.

Third, Lee/Marks used her alleged citizenship issues and the threat of deportation as a reason for Lee/Marks and Jr. to keep their relationship secret.  Jr. revealed his "marriage" to his

cousin Karin Fenimore at their high school reunion in August of 2010. This appears to be the first time Jr. presented his wife to any friends or family members. Fenimore recalls seeing a nametag reading "Ralph and Mary Raines" while setting up the event. This surprised Fenimore. During the reunion, Jr. introduced Fenimore to his "wife" Mary Marks. Jr. later told Fenimore that the couple decided to keep the marriage a secret while Lee/Marks fixed her immigration issues.

The alleged need for secrecy in their relationship served a specific purpose in the fraud scheme. This secrecy helped Rachel Lee and Lee/Marks further isolate Jr. from his then-existing support network. Fenimore reports that prior to Rachel Lee's emergence in Jr.'s life, Jr. dropped by Fenimore's house every few weeks to talk and visit. Fenimore reports that a long period of time passed between interactions prior to seeing Jr. and Lee/Marks at the reunion.

As part of the fraud scheme, Rachel Lee built trust, encouraged secrecy, and isolated Jr. from pre-existing support networks. She did this to extract money from Jr. and limit the influence and scrutiny of others.

### *The Real Person Behind the Mary Marks Name*

Rachel Lee's mother is named Mary Marks. As part of this investigation, agents interviewed Mary Garcia Marks. The real Mary Marks is the mother of five children – Rachel Lee/Marks, Ruby Marks/Miller, Gloria Garcia Martinez, Barney Marks and Dewey Marks. Rachel Lee's mother stated she lived in Oregon for some time, including an approximate six month stay at the Birkendene residence. The investigation revealed Mary Marks also lived for some time at the Canby residence/Psychic Shop. Rachel Lee's mother admitted receiving occasional financial assistance from Rachel Lee.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                  **Page 16**

Shown a picture of the actual Mary Marks, Jr. identifies her as a woman he met through Rachel Lee named "Maria."  According to Jr., he met Maria at the Birkendene house and also traveled with Rachel Lee to California to visit Maria.  Based on his conversations with Maria, Jr. believes Maria came to the United States from the Philippines with her U.S. Naval husband.

### *Rationale for Use of the Name "Mary Marks" in the Fraud Scheme*

The use of the name of a real person for Jr.'s fake wife allowed Rachel Lee and Porsha Lee to open bank accounts in the joint name of Porsha Lee and Mary Marks for use in the fraud scheme.  For example, the defendants opened joint accounts in the name of Porsha Lee and Mary Marks at Bank of America on December 10, 2010 (Savings Account, xx1657) and on February 4, 2011 (E-banking).   The real Mary Marks told investigators she opened joint bank accounts with her granddaughter Porsha Lee at Porsha Lee's request.

Rachel Lee and Lee/Marks directed fraud proceeds to these joint accounts, in the form of wires and checks payable to Mary Marks.   One example from August of 2009 illustrates how defendants Rachel Lee and Porsha Lee used accounts in the name of Mary Marks to facilitate this fraud scheme.

According to Forest Grove Police Incident Report 20091990, on August 17, 2009 Rachel Lee accompanied Jr. to the U.S. Bank in Forest Grove.  At the bank, Jr. transferred $450,000 into an account in Mary Marks' name.  Bank officials, concerned about the possibility of fraud and financial exploitation, called the Forest Grove Police Department (FGPD).  FGPD officers responded and spoke with Jr. and with Rachel Lee about the transaction.  According to the incident report, Jr. explained that Marks called and asked to borrow $450,000 to buy an apartment complex.  Jr. further stated that Marks agreed to pay him back by November.   Jr. told officers that he trusted Marks.  Jr. explained that Marks took care of his finances and knew

**GOVERNMENT'S SENTENCING MEMORANDUM**                                            **Page 17**

exactly how much money he held in his accounts.  When asked by police officers about the transfer of funds to Marks, Rachel Lee confirmed she knew Jr. made a transfer to his friend Mary Marks.  According to the report Rachel Lee added that she knew Marks wanted the money.

### *Mary Marks as Bookkeeper*

Mary Marks received payment from the Raines accounts for services allegedly provided to Jr.  According to attorney Michael Moore, Jr. initially introduced Lee/Marks to him as Jr.'s bookkeeper.  Jr. claimed to Moore and others that he paid Marks for services as a bookkeeper.

On April 19, 2010, "Mary Marks" electronically registered Easy Keeping as an assumed business name with the Oregon Secretary of State's Corporation Division.  Mary Marks is listed as the registrant and authorized representative for Easy Keeping accounting services.  The listed address is a Postal Annex mail box number close to the house on Birkendene.  (Ex. 4)

In contrast, Raines' Certified Public Accountants Russ Ries and Mark Sleasman believed Rachel Lee worked as Jr.'s bookkeeper.  Based on notations in annual ledgers provided to the CPA and input from Rachel Lee, the CPA firm believed Mary Marks worked as Jr.'s personal assistant.

### *CPA Records*

Employees of the Raines' CPA firm, Jarrod Siebert Pollard & Co. LLC, report that their office trained Rachel Lee and Porsha Lee to input the Raines business and personal account transaction history in QuickBooks format.  At the end of the year, either Porsha Lee or Rachel Lee provided the completed electronic ledgers to the CPA firm for tax purposes.  The QuickBooks-style ledgers provided to the CPA firm show account activity for personal and business accounts in years 2009, 2010, 2011 and 2012.  (Ex. 5-12)

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 18**

A copy of the 2011 Raines Tree Farm General Ledger in QuickBooks format shows fourteen total checks written to Mary Marks.  The "memo" notation in the ledger for all payments states "PA-personal ass." (Ex. 10)  The checks range in amount from $350 to $6,125 and total $50,000 in direct payments to Mary Marks from one account in 2011.   CPA Mark Sleasman asked Rachel Lee about the payments to Mary Marks.  According to Sleasman, Rachel Lee said that Marks worked as a personal assistant for Jr.  Sleasman's notes reflect that Rachel Lee further stated that Marks' duties included picking up groceries, cleaning, and completing any task Jr. needed or wanted done on a 24/7 on call basis.   It is unclear whether the real Marks, Porsha Lee, or both benefited from checks made payable to Mary Marks.

Beyond the checks to Mary Marks, the QuickBooks ledgers show years of Rachel Lee directing Raines' account funds to her family's personal use.  The ledgers also show efforts by Rachel Lee and Porsha Lee to conceal their theft by categorizing payments as legitimate expenses.  In some circumstances, they categorized direct payments to friends and family members as loans.  For example, the ledgers reflect $88,000 to Patricia Wilson as a loan.  Patricia Wilson was the partner of Rachel Lee's brother, Dewey Marks.  Records also show over $15,000 in "loans" to Freddy Marks in 2011.  Freddy Marks is the husband of Rachel Lee's daughter, Pebbles Lee.

Rachel Lee and Porsha Lee also cloaked money directed to friends and family as payments for services.  For example, records show thousands of dollars in payments to Christopher Lee for "tree planting."   Christopher Lee is the son of co-defendant Blancey Lee and lived in the Birkendene house.   According to both Christopher Lee and Jr., Jr. never paid Christopher for tree planting.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 19**

### *Mary Marks Raines Tree Farm American Express Cards*

Rachel Lee also caused at least two Raines Tree Farm American Express credit cards to be issued in the name of Mary Marks. The first charge on the Mary Marks American Express (xx1013) is dated June 16, 2010. This is the first of thirteen Raines Tree Farm American Express cards Rachel Lee authorized in the name of Mary Marks, Rachel Lee, Porsha Lee, or Blancey Lee. Charges to the Mary Marks cards between June 2010 and September 2012 total $145,145.50. (Ex. 13)

### *Mary Marks and Birkendene Ownership*

On November 17, 2010, Rachel Lee caused Jr. to transfer the Birkendene house to Mary Marks for zero consideration. (Ex. 14)   At that point, Rachel Lee's mother legally owned the house, but Rachel Lee controlled the property. Over a year later, attorney Michael Moore insisted the property be returned to Sr.'s probate estate holdings. At the time of the transfer to Mary Marks, Sr. owned the house. Sr. died less than three months later.   At Rachel Lee's direction, on March 27, 2012, Rachel Lee's mother granted the property to Jr. as the personal representative of the estate of Sr. by means of a quitclaim deed. (Ex. 15)

### *Mary Marks as the Mother of Jr.'s Child Giorgio*

According to Jr., prior to Lee/Marks suggesting marriage, Lee/Marks asked Jr. to father a child with her through a sperm donation.   On September 25, 2014, Jr. discussed his recollection of the circumstances under which he fathered a child with Lee/Marks.

Jr. recalls Lee/Marks asking him to father a child with her by means of in vitro fertilization. He agreed. Jr. claims that Rachel Lee and Lee/Marks gave him a metal container that looked like a cooking pot. As directed by Lee/Marks, Jr. placed his donation in the insulated pot along with dry ice. He stored the pot in his refrigerator in Gaston. Later, Lee/Marks called

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 20**

Jr. and asked him to meet her at the airport with the donation.  According to Jr., Lee/Marks planned to return to California.   She planned to deliver the sample to a doctor who would perform the procedure.  Jr. believed Lee/Marks made arrangements to transport the donation on her plane in a freezer.

Jr. recalls Lee/Marks calling to tell him the procedure worked and she was pregnant with his child.  Jr. saw Lee/Marks at least once during the pregnancy.  He described her as visibly pregnant.  Jr. did not attend or participate in the birth of this child.  He claims that after the birth, Lee/Marks employed Rachel Lee as the child's nanny.  The child lived with Rachel Lee at the Birkendene home.  Lee/Marks visited her son at the Birkendene house, as did Jr.  According to Jr., Lee/Marks selected the child's name – Giorgio Armani.

Jr. claims that initially, Rachel Lee did not know that Jr. fathered little Giorgio with Lee/Marks.  In later years, both in private and in public, Rachel Lee appeared with both Jr. and Giorgio and presented Giorgio to others as Jr.'s son.

Giorgio Armani Lee is the child Jr. believes is his son.  Born in December of 2008, his birth certificate lists his mother as Pebbles Lee. (Ex. 16)  Pebbles Lee is a daughter of Rachel Lee.  No information regarding the child's father is provided on the birth certificate.  Based on the investigation, Rachel Lee and Porsha Lee created the pregnancy story because Porsha Lee was pregnant at the time.  After Porsha Lee gave birth to her child, the child's father took the child from her.  Therefore, Rachel Lee and Porsha Lee needed another child to present to Jr. as his own.  Pebbles Lee and Porsha Lee gave birth to their children within weeks of each other.  Pebbles Lee left her child in her mother's care.  Rachel Lee introduced baby Giorgio into the fraud scheme in the role of the son of Jr. and Lee/Marks.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                          **Page 21**

Jr. describes Giorgio in diapers, but not a newborn, when they first met.   Therefore, Rachel Lee and Lee/Marks likely hatched the pregnancy story in mid-2008 and introduced Jr. to Giorgio sometime in 2009.

In video seized from the Canby house computer, Giorgio is seen and heard calling Jr. da-da.  In one video, Jr. sits on the couch in the Birkendene house in his work clothes, filming himself with toddler Giorgio on his lap.  Jr. speaks to the camera and says "hi Mom" and "Giorgio and I sure miss you."  (Ex. 132, 133)  Jr. reports he frequently communicated with Lee/Marks by sending her videos and pictures via iPhone.

**Rachel Lee, Porsha Lee, and Other Family Members Conspired to Maintain the Mary Marks Persona:  Evidence from Search Warrant**

Porsha Lee was approximately 18 years old in 2007 when her mother dressed her in a disguise, sent her to the Portland airport, and enlisted her in this fraud scheme.  At the direction of her mother Rachel Lee, Porsha Lee played the role of Mary Marks from 2007 through 2014.  Throughout the fraud, Porsha Lee remained in character as Mary Marks in the presence of Jr. and others - sporting the wig, the hat, and the glasses, and consistently faking a British accent.

Digital photographic and video evidence seized from a computer at the Canby residence shows Lee/Marks with Jr., Rachel Lee, and other Lee family members over the span of years.  Lee/Marks and Jr. are pictured at the Birkendene house celebrating holidays including Thanksgiving and Christmas.  (Ex. 88, 89, 79)  Lee/Marks, Jr. and Rachel Lee are captured traveling to forestry conferences.  (Ex. 81)  One series of pictures shows Lee/Marks, Jr., Rachel Lee and Samantha Lee (who Jr. knows as Porsha Lee) visiting Multnomah Falls.  (Ex. 82-86)  Jr. is pictured at the Birkendene house multiple times with Blancey Lee's son Christopher Lee (who Jr. believed to be Rachel Lee's cousin) and Christopher's wife Brenda Marks (who Jr. knew as

"Megan").  Brenda Marks and Christopher Lee both lived in the Birkendene house for some time.  It appears that Jr. captured most the pictures and video himself.

The pictures and video are notable for the images contained in them, and the images not captured.  None of the pictures appear to show Porsha Lee out of character.  Only one picture shows Blancey Lee.  In it, Blancey Lee is sitting at a table with Sr. and baby Giorgio, prepared to share a meal.  (Ex. 73)

No seized pictures or videos show Blancey Lee together with Porsha Lee as Mary Marks.  No other direct evidence suggests Blancey Lee's knowledge of or involvement with the Lee/Marks persona.  Blancey Lee denies any knowledge of the use of the Marks persona during the fraud scheme.

During the search warrant at the Canby Psychic Shop officers located two versions of the Marks disguise.  Officers found the first set, including a wig, a hat, and glasses, hidden between the mattress and box spring in the bed Rachel Lee and Blancey Lee shared.  Officers found a second blond wig hidden in a drawer in the home.  (Ex. 114-116)

**2007 – 2011: Rachel Lee Establishes Legal Control Over Jr**.

Rachel Lee claimed to be a person that Jr. could trust and rely on.  After Rachel Lee's arrest, Jr. continued to describe Rachel Lee as his best friend.  The mastermind of this extensive fraud, she knew Jr.'s hopes and dreams and provided him with a false version of the things he most wanted – friends, a wife, and a child.  She created this false world and carried on this con for years the purpose of extracting money from Jr.   As part of her plan, prior to Sr.'s death, she acquired legal control over Jr. and his estate.

### *Durable Power of Attorney: March 2008*

On March 17, 2008, Rachel Lee and Jr. executed a Durable Power of Attorney (POA) form, appointing Rachel Lee as Jr.'s attorney-in-fact and Agent.  (Ex. 17) With the execution of this document, Rachel Lee acquired the power to control Jr.'s life and finances.  In addition to other powers, the POA authorized Rachel Lee do the following on behalf of Jr: make expenditures; dispose of or take possession of real or personal property; cancel or continue credit cards or charge accounts; borrow; redirect mail; act as guardian or conservator in the event of incapacitation; and perform any other act necessary to carry out the powers granted under the POA.

Attorney Michael Moore prepared and personally notarized the POA.  It is unclear why Jr. executed this form in March of 2008, just 15 months after Rachel Lee assumed her role as Sr.'s caregiver.   During an investigative interview, on June 5, 2014, Moore stated that he met Rachel Lee many times over the years.  Initially, Rachel Lee accompanied Jr. to Moore's office.  During their early interactions, Moore believed that Rachel Lee acted exclusively as Sr.'s caregiver and assisted Jr. in running errands.  Moore claims no knowledge of Jr. handing over management of his financial or business affairs to Rachel Lee prior to Sr.'s death in February of 2011.

Moore described Rachel Lee as "very friendly."  According to Moore, Rachel Lee told him she was a widow.  She claimed that she and her ex-husband lived in Bend, Oregon before he passed.  She also claimed her husband worked as an auto mechanic before he passed away.  Moore reports that Rachel Lee told him that she and Jr. maintained a friendly, platonic relationship.  Moore claims Rachel Lee approached him at one point and suggested the two engage in a romantic relationship.  Moore states he declined her offer.

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 24**

***Rachel Lee and Mary Marks as Beneficiaries of Jr.'s Will: December 2010***

Less than two months before Sr. died, Jr. executed a will.  (Ex. 18)   Michael Moore's office prepared the will at Jr.'s direction.

In the will, Jr. names Rachel Lee as his personal representative and Mary Marks as her replacement if Rachel Lee is unable to serve in that capacity.    Pursuant to the will, Jr. grants all of his personal property and the entire residue of his estate to Rachel Lee and to her descendants by right of representation.  In the event that neither Rachel Lee nor her descendants survive Jr., he grants the entirety of his estate to Mary Marks.   In the section of the will entitled "Article 1: Family", Jr. states that he is "not married" and has "no descendants".  The will is signed and dated by Jr. on December 9, 2010.  Two staff employees of Moore & Ballard, including Jayme Chuinard, signed the will as witnesses to Jr.'s signature.

Ms. Chuinard told agents she started working at Moore & Ballard in 1988.  During the entire length of her employment, she worked as a legal assistant to Michael Moore.  Ms. Chuinard recalls witnessing the will, in part because the office Christmas party happened the same day, and Jr. and Rachel Lee both attended the party.  Ms. Chuinard noticed Jr. wearing a wedding ring when he signed the will.  This surprised Ms. Chuinard, since she believed Jr. was not married, consistent with the language of the will.  Ms. Chuinard stated that Rachel Lee followed Moore around at the party and "flirted" with him.

Ms. Chuinard recalled Jr. coming to the office primarily in conjunction with the probate of his father's estate in 2011.  She described Jr. as "anti-social" and "never spiffed up."  She believed he typically came to the office directly from working on the tree farm without cleaning up first.   During this time, Rachel Lee typically accompanied Jr. to Moore's office.  As opposed to Jr., she described Rachel Lee as very well dressed.

Ms. Chuinard recalled that Jr., Rachel Lee and Mary Marks jointly communicated with their office to complete the probate of Sr.'s estate.  She recalled in person meetings with Jr. and Rachel.  Meetings with Jr., Rachel Lee and Lee/Marks are detailed in Sr.'s probate estate filings. (Ex. 19)  According to Ms. Chuinard, in these meetings Rachel Lee did most of the talking for Jr. Based on her interactions, Ms. Chuinard believed Rachel Lee dominated Jr. and made decisions for him.  Jr. told Moore's staff to talk to Rachel Lee or Mary Marks first if questions arose during the probate process.   During the probate process, Ms. Chuinard dealt with Lee/Marks exclusively on the phone or in writing.  She did not see Mary Marks in person during this time period.  Ms. Chuinard recalled one time, before the probate process, when Jr. brought Mary Marks to the office and introduced her as his bookkeeper.

### Rachel Lee as Sr.'s Caregiver: Early 2007 – Early 2011

Jr. hired Rachel Lee to serve as his father's caregiver shortly after his stroke in late 2006. Based on a review of records, Jr. agreed to pay Rachel Lee $8,985 per month for full-time care for Sr.  Rachel Lee initially provided care to Sr. at the A-frame home in Gaston.   Rachel Lee transacted the first 2007 check payable to "Home Care" on January 8, 2007.   Records reveal three checks payable to Rachel Lee in December of 2006 totaling $8,000.  Therefore, Rachel Lee began her role as Sr.'s paid caregiver no later than January 2007.

#### *Quality of Care*

Ethel Kelly is a long-time friend and neighbor of the Raines family.   As earlier noted, Kelley previously worked in nursing, lived very close to the Tree Farm, and frequently spent time with Jr. and Sr.  Kelly states that Sr. paid her to assist with cleaning the A-frame after his wife passed away in 2001.  Given her background, proximity, and relationship with the Raines,

Kelly offered to help with Sr. after his stroke.  Instead, Jr. hired Rachel Lee, a psychic by trade, to care for his father.

Kelly and others report that Rachel Lee often took Sr. into Gaston to meet with others. Kelly claims that from time to time, community members called Kelly to pick Sr. up and take him home when Rachel Lee did not respond.

During the time that Sr. remained at the A-frame, Kelly occasionally dropped in on Sr. to check on his well-being.   Kelly claims that she often found Sr. in a state of neglect.   Kelly recalls that Rachel Lee failed to bathe Sr.   Kelly states she once took Sr. into the shower herself in Rachel Lee's presence to show Rachel Lee how to properly bathe someone in Sr.'s condition.

Kelly claims she urged Rachel Lee to engage Sr. in physical or occupational therapy after the stroke, but Rachel Lee refused.  Kelly also noticed that Rachel Lee failed to properly administer Sr.'s medication.   On one occasion, Kelly recalls finding Sr. sitting a chair in the A-frame clothed only in a diaper.

Kelly confronted Rachel Lee about her lack of adequate care for Sr.  Kelly claims she approached the A-frame and saw Rachel Lee packing up her car and ignoring Sr.  Kelly attempted to engage with Rachel Lee and Rachel Lee ignored her.  When Rachel Lee refused to engage, Kelly physically grabbed Rachel Lee and slammed Rachel Lee against the side of Lee's car.  With Rachel Lee's full attention, Kelly accused her of providing poor care to Sr.  Rachel Lee claimed her experience caring for her sick husband prior to his death had not adequately prepared her for the level of care Sr. required.

Another Raines neighbor, Bonnie Moore, claims Rachel Lee provided Sr. with insufficient care.  Moore claims she provided care for Sr. for a short while before Jr. hired Rachel Lee.  Bonnie Moore received at least one check from the Raines Logging Company,

**GOVERNMENT'S SENTENCING MEMORANDUM**                                      **Page 27**

dated January 7, 2007.   Based on his practice of using military style dates (date/month/year), it appears that Jr. prepared and issued this typed check.

Bonnie Moore reports she occasionally dropped in on Sr. in 2007.  She recalls she once found Sr. sitting unattended in a dirty diaper with an open bottle of whiskey within reach.

### Rachel Lee Uses Raines' Money to Pay Others to Care for Sr.

Despite her 24/7 care agreement with Jr., Rachel Lee paid other women to provide care to Sr. during Rachel Lee's absence.  Ethel Kelly reports that during her visits to check in on Sr. at the A-frame, she rarely saw Rachel Lee.  According to Kelly, Rachel Lee hired a woman named "Chris" to assist with Sr.'s care.  Bonnie Moore identified Chris Jefferies and Maxine Brake as two women Rachel Lee hired to assist with Sr.'s care.

Agents attempted to speak with Maxine Brake, but did not locate her.  Maxine Brake received routine checks written on the Raines Logging Company account from September 14, 2007 through October 29, 2008.  Maxine Brake also received one check on March 26, 2009 ($900.00) and again on Mary 17, 2010 ($600.00).

Agents contacted Chris Jefferies, who confirmed that Rachel Lee hired her to provide care to Sr. at the A-frame.  According to Jefferies, Rachel Lee claimed she could not handle Sr. by herself.

Jefferies is uncertain of the time frame during which she provided care.  Two checks written to Jefferies from the Raines Logging Company account are dated March 4, 2008 and March 31, 2008.  (Ex. 20)  Therefore, Jefferies care for Sr. at the A-frame included March of 2008 at a minimum.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                      **Page 28**

Jefferies claims she visited Sr. on an "almost daily" basis.  Jefferies stated that when she started her care for Sr., Rachel Lee stopped providing daily care.  Jefferies knew Rachel Lee lived in a house in Northwest Portland, but Jefferies never visited the Portland home.

According to Jefferies, Sr. could not eat solid food after the stroke.  Rather than purchase and prepare soft food for Sr. compatible with adult nutritional guidelines, Rachel Lee fed Sr. baby food.  Jefferies claims she prepared suitable grocery lists and directions for Rachel Lee, but Rachel Lee did not purchase the food items Jefferies requested for Sr.

Jefferies claims she expressed her concerns to Jr., but Jr. deferred to Rachel Lee regarding Sr.'s care.  Rachel Lee fired Jefferies after Jefferies expressed her concerns to Jr. and to Raines family member Karen Gerrish.  Jefferies claims Rachel Lee accused her of stealing two antique World War II era guns from the A-frame as the basis for her firing.  In fact, Blancey Lee sold these two guns to a pawn shop in Bend area in 2010. (Ex. 41)

Based on the payments to additional caretakers, and the report of Chris Jefferies, Rachel Lee likely moved Sr. from the Tree Farm in Gaston to the Birkendene home at some point between March of 2008 and October of 2008.   Jefferies claims Rachel Lee moved Sr. to the Portland home shortly after Rachel Lee fired Jefferies.

### From the A-frame to Birkendene

At the Birkendene house, Rachel Lee set Sr. up in a hospital bed in the hall outside her expansive master bedroom.   According to accounts from individuals who lived in the home, Sr. and his hospital bed remained in the hallway during the years he lived in the home.  Rachel Lee and Blancey Lee, their children, and their relatives consistently occupied the four bedrooms in the home.   Rachel Lee never provided Sr. with a private bedroom or bathroom in the expansive home, despite the fact that Sr.'s money purchased the home, furnished the home, and paid the

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 29**

bills.  Sr. also owned the home on paper from October 23, 2008 through November 17, 2010 and his.

During Sr.'s many years at Birkendene, Rachel Lee only permitted Jr. to visit with Sr. Rachel Lee did not allow other Raines family members to visit Sr. at the home.  Family members understood that Rachel Lee moved Sr. to a home in Portland, but Rachel Lee never provided an address or invited family members over.

Relative Karen Gerrish discovered the address and went to the home.  Gerrish reports that Rachel Lee answered the door, but would not allow Gerrish into the house.  Aside from Jr., no Raines family member every set foot inside the Birkendene home or saw Sr. there.  Therefore, none of Sr.'s family members or friends can provide insight into the level of care provided to Sr. at the Birkendene house.

Brenda Marks is Blancey Lee's daughter-in-law and the wife of Christopher Lee.  She lived at Birkendene during the relevant time period.  Brenda Marks told agents that she often assisted with Sr.'s care in Rachel Lee's absence.  Seized images in picture and video format show Brenda Marks assisting Sr. at a Raines family Christmas party[1].  (Ex. 130)  Raines family members claim that Rachel Lee never brought Sr. to Raines family functions.

Jr. and all interviewed Lee family members claim that Rachel Lee provided Sr. with excellent care.   It is the government's position that the statements of Jr. and members of the Lee family are unreliable as to Sr.'s care.  Jr. is the victim of long-term undue influence and currently

---

[1] Jr. knows Brenda Marks as "Megan," not as Brenda.  Jr. introduced her to family members as "Megan."  In one seized video, Jr. is heard telling a family friend that he hired Megan (not Rachel Lee) as a caretaker for his father.   Rachel Lee also introduced her daughter Samantha to Jr. as "Porsha."  In Jr.'s phone, the picture associated with the contact name "Porsha" is actually Samantha Lee.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 30**

experiences memory deficiencies.  Lee family members' statements can be attacked based on bias and a desire to minimize Rachel Lee's criminal conduct.

Seized digital evidence reveals several pictures of Sr. in the Birkendene home sitting at the kitchen table along with the Lee family.   One picture shows Sr. in his hospital bed in the hallway of the Birkendene home.  Jr. claims he took this picture.  The picture speaks for itself. (Ex. 80)

### Sr. Passes: February 2011

Sr. died at 91 years of age on February 2, 2011.  Rachel Lee is listed as the "informant" on the Certificate of Death. (Ex. 21)  His place of death is listed as an adult foster care facility in Happy Valley, Oregon.  The cause of death is listed as "undetermined natural causes." According to Jr., Rachel Lee moved Sr. to the adult foster care facility two days before his death.

Michael Moore, neighbors Janine and Hank Scott, and others interviewed in this investigation recalled Sr.'s funeral.   Rachel Lee attended the funeral with Giorgio Lee and Christopher Lee.  Porsha Lee did not attend as Mary Marks.  At the funeral, Jr. publicly introduced Giorgio Lee as his child.  Those in attendance recall that Jr. delayed the service for over thirty minutes waiting for his "wife" to arrive and attempted to contact her by phone. During the service, Jr. apologized for his wife's absence.  Months after the service, Jr. added his name and the name of Mary (as daughter-in-law) and Giorgio (as grandchild) to his parents' memorial grave marker. (Ex. 90)

According to Ethel Kelly, Jr. approached her at the funeral and told Kelly that Rachel Lee didn't want Kelly to see Jr. anymore.  Kelly did not see or talk with Jr. again until after the initiation of this investigation.  Other Raines family members report minimal contact with Jr. between Sr.'s death and 2014.

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 31**

By the time of Sr.'s death, Jr. completely and fully trusted his "best friend" Rachel Lee and his "wife" Porsha Lee/Marks. Over years of grooming, Rachel Lee and Porsha Lee/Marks created a false world for Jr. They executed a calculated plan that caused Jr. to become completely dependent on them for all personal and business financial matters and decision making. Rachel Lee and Porsha Lee/Marks isolated Jr. from family and friends and anyone that might question their control of Jr. With the help of attorney Michael Moore, Rachel Lee held Power of Attorney over Jr. and stood to inherit his entire estate as the beneficiary of Jr.'s will. [2]

### 2007 – 2011: Investment Liquidations

Rachel Lee liquidated all but $100,000 of Sr.'s and Jr.'s investment accounts by the time of Sr.'s death. Between January of 2007 and January of 2011, Rachel Lee liquidated and stole approximately $4.2 million in Raines assets from investment accounts. (Ex. 22) The majority of those funds came from UBS accounts in the name of Sr. and Jr.

As part of this investigation, agents interviewed John Runyan. Runyan worked for UBS Financial Services as a financial planner until 2011. Runyan handled Sr.'s financial portfolio for many years. Up until his stroke in 2006, Sr. actively worked with Runyan on the management of his account.

After Sr.'s stroke, Runyan met Jr. and Jr. began to provide direction of the UBS portfolio on behalf of Sr. The first time Runyan met Jr., Rachel Lee accompanied Jr. Soon after Jr. assumed control of account decisions, Runyan began receiving requests from Jr. and Rachel Lee to sell stock. Runyan claims Jr. and Rachel Lee told Runyan they planned to buy additional timber property with the proceeds. Given the state of the market at the time, Runyan counseled

---

[2] Ethel Kelly, Chris Jefferies, and John Runyan all claim they contacted Moore's office and expressed concerns regarding Rachel Lee's actions and motives as early as 2008. Portland Police Detective Elizabeth Cruthers contacted Moore in March of 2013 with concerns regarding financial exploitation. Moore did not intervene.

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 32**

Jr. and Rachel Lee against this action.  Runyan believed Rachel Lee made financial decisions for Jr. and Jr. acted at her direction.

A review of the UBS account distributions beginning in 2004 reveals a pattern change in 2007.  (Ex. 23)  Jr. identified his father's signature on 2006 and earlier distribution checks with average amounts of $15,000 or less.  Beginning in February of 2007 and continuing through 2011, the distribution amounts dramatically increase.

On November 8, 2011, in the form of a check for $113,633.98, Rachel Lee liquidated the last of Sr.'s UBS account.  Immediately after Sr.'s death, with the Raines family investments accounts depleted, Rachel Lee turned her attention to their last available asset – the Tree Farm.

**2011 – 2012: The Tree Farm Sales**

As Jr.'s wife, Porsha Lee/Mary Marks exerted tremendous personal influence over Jr.  As Mrs. Ralph Raines Jr., Lee/Marks played a significant role in Jr.'s legal and business affairs.  For example, Lee/Marks negotiated sales of all the Tree Farm properties on behalf of the victim.

After Sr.'s death, Pat Griffith received a call from Lee/Marks.  Pat Griffith is a relator and longtime associate of Jr.  According to Griffith, Lee/Marks identified herself as Jr.'s new wife.  She stated that she and Jr. needed to sell part of the Tree Farm properties to make payments to the Internal Revenue Service (IRS).   Neither Jr. nor Lee/Marks ever discussed any other motive for selling the Tree Farm with Griffith.

Jr. brought Lee/Marks to meet Griffith.  Griffith recalls meeting Lee/Marks no more than five times in person.  He describes Lee/Marks as a younger woman with a British accent and glasses, who wore a brimmed hat over her long blond hair.  Jr. authorized Lee/Marks to handle all the details of the listing and sales of the properties with Griffith.   Despite meeting Lee/Marks in person, Griffith primarily communicated with Lee/Marks by phone or text.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 33**

Griffith met Rachel Lee.  He knew Rachel Lee as Sr.'s caretaker and later as the nanny who cared for Lee/Marks son, Giorgio.  According to Griffith, Rachel Lee played no role in the sale of the Tree Farm properties, but sometimes drove Jr. to the office to sign paperwork. Griffith recalled one instance where Jr. hesitated before signing paperwork.  Griffith heard Rachel Lee speak to Jr. about signing documents in a manner Griffith described as "pushy."  To encourage Jr. to complete the paperwork, Rachel Lee reminded Jr. of his earlier conversation with Lee/Marks the same day.   Given Rachel Lee's role as Giorgio's nanny, this exchange struck Griffith as odd.

Griffith did not know and never met Blancey Lee.

At Lee/Marks direction, Griffith listed and sold the following parcels on the specified dates for the amounts listed:

| List Date | Closing Date | Property | Sales Amount |
|-----------|--------------|----------|--------------|
| May 7, 2011 | July 27, 2011 | 56 acres – North Plains | $1,024,500 |
| May 7, 2011 | September 23, 2011 | 134 acres – Gales Creek | $1,407,000 |
| unknown | January 11, 2012 | 40 acres – Gaston | $1,075,000 |
| April 14, 2012 | July 31, 2012 | 869 acres – Gaston | $8,770,000 |

Upon completion of the sale, the title company wired the net proceeds of each sale to the Raines Tree Farm bank account (xxx0314).  Rachel Lee then transferred the proceeds to accounts under her full control.

In addition to the Tree Farm properties, Jr. inherited 320 acres of cow pasture in Molalla, Oregon from his maternal grandfather.   In March of 2011, Griffith listed the cow pasture for sale at Lee/Marks's direction.  In July of 2011, Griffith reduced the sales price of the property to $599,900.  Griffith consulted with Lee/Marks via email regarding this reduction.  (Ex. 24)  Jr. allegedly consented to this price reduction via email.  The investigation revealed that Rachel Lee and Lee/Marks accessed and utilized the raines2908@gmail.com  account.  Therefore, it is

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 34**

impossible to determine if Jr. actually agreed to the price reduction, or if Rachel Lee or Lee/Marks responded on Jr.'s behalf. This property did not sell within a year and Griffith took the listing off the market.

After Griffith removed the property from the market, Lee/Marks contacted Griffith and asked that Rachel Lee's name be added to the title for this property. Griffith communicated this request to the title company. The title company did not add Rachel Lee's name to the property title.

### *Gloria*

In 2012, during on the ongoing sales of the Tree Farm properties, Rachel Lee and Porsha Lee/Marks convinced Jr. that he and Lee/Marks conceived their second child. Jr. claims that he and Lee/Marks repeated the process they previously used and conceived their second child through in vitro fertilization. Jr. captured a picture of himself and his "pregnant" wife. (Ex. 92) The picture shows Lee/Marks in a sundress with a fake baby bump under her dress. Jr. believes the picture shows Lee/Marks pregnant and does not believe Lee/Marks faked the pregnancy.

According to Jr., Lee/Marks told him they were expecting a girl, with a delivery date in December of 2012. Jr. states that since Lee/Marks selected the name for their son, the two agreed that Jr. could select the name of their daughter. Jr. chose the name Gloria Jean. Jr. bought a vanity plate for a car, proudly displaying the names of his growing family. (Ex. 91)

In December of 2012, Jr. reports Lee/Marks called Jr. and told him that she lost the child. Jr. claims the loss of Gloria greatly affected him and his "marriage." He claims the loss of the child strained his relationship with Lee/Marks and Lee/Marks became more distant.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 35**

### *Last Properties*

In December of 2013, Lee/Marks called Griffith to list Jr.'s last two Tree Farm holdings, including Jr.'s home, the A-frame Sr. built.   Lee/Marks told Griffith that Jr. still owed money to the IRS and needed the proceeds of the sales to pay the IRS.  Jr. signed the paperwork to list the two properties for sale on December 24, 2013.   At Lee/Marks direction, Griffith listed the following parcels on the specified dates for the price noted: (Ex. 25)

| *List Date* | *Property* | *List Price* |
|-------------|-----------|--------------|
| January 1, 2014 | 62.4 acres – old Lee house | $389,900 |
| January 1, 2014 | 80 acres – A-frame home | $479,900 |

 Griffith did not sell these properties.  As a result of the criminal investigation, Griffith pulled both listings from the market on March 26, 2014.   Without the intervening disruption caused by the criminal investigation, Lee/Marks and Rachel Lee could have stolen an additional $869,800 from the victim.   Jr. would have lost his home and the last two vestiges of the Raines Tree Farm.

### *Rachel Lee Sold the Tree Farm Properties Knowing the Sale Would Generate Tax Liabilities for Jr.*

In addition to the representations made by Lee/Marks to Griffith, Jr. told others that he had to sell the Tree Farm properties in order to pay taxes generated as a result of his father's death and related estates taxes.   This is a lie created and maintained by Rachel Lee to fraudulently induce Jr. to sell the Tree Farm.  Michael Moore told agents that the estimated estate taxes due totaled approximately $115,000.

To the contrary, Rachel Lee generated over one million dollars in tax liabilities for Jr. by selling the properties. After Sr.'s death, CPA Russ Ries met with Rachel Lee and Jr. to discuss the several beneficial tax exemptions and deductions they could take in the computation of the

estate taxes.  These included a federal natural resource credit and an Oregon closely held

company deduction.  Ries explained that if they took advantage of the deductions and

exemptions, they could not sell the Tree Farm in the near future.  Ries believed Rachel Lee

understood all the tax issues Ries explained to her.

Despite this understanding, Rachel Lee sold the Tree Farm and generated additional

taxes.  Ries counseled Rachel Lee and Jr. against selling the property.   Ries expressed concern

and reached out to Michael Moore via email.  In the email, Ries alerts Moore to the sale, and

asks if Moore knew that Rachel Lee took steps to sell the Pumpkin Ridge Tree Farm holdings.

(Ex. RRI1046)

Between 2011 and 2014, Rachel Lee and Lee/Marks convinced Jr. that the sale of the

Tree Farm properties did not generate sufficient profits to cover his tax obligations.   In early

2014, Jr.'s neighbor Don Scott visited with Jr.  Jr. claimed that Mary said he needed to generate

more income and file for bankruptcy because he owed more money to the IRS.  Don Scott tried

to explain to Jr. that the outstanding tax story did not make sense given the value of the Tree

Farm.   Jr. remained convinced that Lee/Marks told him the truth.

Rachel Lee used Jr.'s need to pay outstanding taxes as a means to direct funds into her

own accounts.   On July 29, 2013, Rachel Lee deposited a July 15, 2013 cashier's check payable

to the Oregon Department of Revenue into joint account xx9334.  (Ex. 26)   The day after this

deposit, Rachel Lee transferred $490,000 to her Rachel Lee only Columbia savings account.

In 2014, Jr. stated he believed Rachel Lee directed this payment to the Oregon

Department of Revenue as payment on Jr.'s outstanding tax liabilities.   Jr. endorsed the check,

but did not add the printed statement "Not Used For Any Purpose Intended."

**GOVERNMENT'S SENTENCING MEMORANDUM**                                                    **Page 37**

**Rachel Lee Handled All Tax and Bookkeeping Matters on Behalf of the Tree Farm after Sr.'s Stoke**

According to Ries, Rachel Lee served as the primary point person for all Tree Farm related tax and accounting issues between 2007 and 2014. Ries reports that he only met Jr. two times in person. The first time, Jr. came to the office to tell the staff about Sr.'s stroke. Rachel Lee accompanied Jr. Jr. introduced Rachel Lee to Ries as Sr.'s home care worker and as Jr.'s girlfriend. Ries stated that Rachel Lee claimed to have accounting and bookkeeping experience and volunteered to computerize all of the Tree Farm business records.

After Rachel Lee began managing the Tree Farm accounts, Jr. told Ries to run all their questions about the Tree Farm accounts through Rachel Lee. From that point on, Ries and his employees directed all their Tree Farm account questions directly to Rachel Lee. Rachel Lee provided Ries' firm with Tree Farm financial statements and answered all related questions. (Ex. 27)

Emails from Ries' firm show years of questions directed to Rachel Lee at the email address porsha777@yahoo.com. Rachel Lee also communicated with Ries using Jr.'s email account address raines2908@gmail.com. (Ex. 27)

Ries believed his second in-person interaction with Jr. occurred after Sr.'s death in conjunction with the preparation of the estate taxes as noted above. After Sr.'s death, Ries believed Jr. employed Rachel Lee as the bookkeeper for the Tree Farm.

Prior to 2010, Ries' firm handled tax matters for the Tree Farm and personal tax matters for Sr. After 2010, Ries' firm began to handle Jr.'s personal tax matters. Ries' firm also communicated with Rachel Lee regarding Jr.'s personal tax matters.

In 2013, in conjunction with an audit, Ries asked Rachel Lee about amounts paid to herself, Porsha Lee, Blancey Lee and Erica Adams between 2008 and 2010. Rachel Lee lied in

**GOVERNMENT'S SENTENCING MEMORANDUM                    Page 38**

her response.  Rachel Lee told Ries that all funds provided to herself and Porsha Lee were gifts. Rachel Lee also stated that Blancey Lee and Erica Adams received payment for services.  Rachel Lee specified that Erica Adams served as Sr.'s caregiver.  (Ex. 28)  Ries did not challenge Rachel Lee on these assertions.

Ries and Rachel Lee continued to communicate regarding Jr.'s tax matters into 2014.  As late as January 2014, Ries responded to an inquiry from Rachel Lee regarding the tax credits or deductions available to the purchaser of a Tesla Model S. (Ex. 29)

**Rachel Lee's Taxes**

Despite Rachel Lee's involvement with tax matters for the Tree Farm and Jr. personally, Rachel Lee never filed her own personal federal or state taxes or engaged a tax preparer to do so for her.

Laurie Mills, who prepared taxes for Blancey Lee, told agents she offered to prepare personal taxes for Rachel Lee.  According to Mills, Rachel Lee declined and replied that someone else took care of her tax matters.

**Rachel Lee's Financial Control of Jr. and Bank Accounts**

From the earliest days, Rachel Lee financially exploited Jr.  She used her access and position to steal money from Sr. and Jr. for her use and her family's use without Jr.'s knowledge or approval. Rachel Lee's personal use of Jr.'s and Sr.'s accounts dramatically increased over time with dire consequences for the victims.

Rachel Lee's control and unauthorized exploitation of the Tree Farm accounts and all forms of Raines' income sources is on full display throughout the bank and financial records in this case.   A full review and accounting of the bank accounts, credit cards, and related transactions from 2007 through 2014 is not possible in this memo.  The following account

information provides insight into the level of control Rachel Lee exercised.  This account information is also illustrative of the escalating pattern of financial abuse over the length of the fraud scheme. (Ex. 30)

*2007*

On February 2, 2007, Rachel Lee directed Jr. to sell stock from the UBS portfolio resulting in net proceeds of $308,082.  They deposited the proceeds in the Raines Logging account (xx6923).  In 2007, Jr. signed 35 checks payable to either Home Care or Paul Lee drawn account xx6923.  Each of these checks is typed, with Jr.'s signature on the check.  Jr. reports that he signed any check presented to him by Rachel Lee, blank or otherwise.

The Home Care checks are checks for Rachel Lee's services.  They total $161,712 – more than two times Rachel Lee's agreed up pay to serve as Sr.'s caregiver.

Checks payable to Paul Lee total $104,100.  Paul Lee is Blancey Lee's father.  Jr. does not know Paul Lee and never authorized payment to Paul Lee for any purpose.

Together, checks to Paul Lee and Home Care total $265,812 and offset all but $40,000 of the February 2007 UBS distribution.

*2008*

In 2008, Rachel Lee directed $293,748.39 in UBS portfolio distributions to the Raines Logging Company account (xx6923).  Jr. signed 29 checks payable to Home Care, Paul Lee, Blancey Lee, Rachel Lee and Porsha Lee.  These checks total $319,870.00.  The records reveal that Rachel Lee paid herself a $8,985 "paycheck" typically two times per month, for a monthly total of $17,970.  In October, she paid herself three times.  In 2008, seven checks are payable directly to Blancey Lee.   Only two checks are directly payable to Porsha Lee.  In contrast to 2007, just one check is written to Paul Lee for $9,000.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                       **Page 40**

In 2008, the checks are not uniformly typed.  A check dated February 20, 2008, payable to Lexus of Portland for $3,260, appears to be written by Rachel Lee.  This and the remainder of the 2008 checks bear Jr.'s signature.   Once again, Jr. states that he signed any check presented to him by Rachel Lee, blank or otherwise.  Other checks which appear to be written out by Rachel Lee are payable to Blancey Lee, Michael Mitchel (Rachel Lee's son in law, married to Krystal Lee), and Michael Lee (Rachel Lee's then son in law, married to Porsha Lee).

*2009*

In 2009, Rachel Lee directed approximately $2.15 million dollars in UBS portfolio distributions to the Raines Logging Company account (xx6923).  Jr. signed 33 checks payable to Rachel Lee, Blancey Lee, and Porsha Lee.  There are no checks from this account to Home Care or Paul Lee in 2009.

Blancey Lee received two checks payable to him totaling $42,000.  Porsha Lee received eleven checks, totaling $83,254.  The majority of the checks are typed with Jr.'s signature.  This includes a check for $78,500 payable to Patricia Wilson (wife of Rachel's brother, Dewey Hayes).

On August 31, 2009, Rachel Lee opened two new Columbia Bank accounts – a joint account with Jr. (xx7270) and a Rachel Lee only savings account (xx1074).  By creating these accounts, Rachel Lee directed her illegal activities to accounts not subject to the limited scrutiny given the Tree Farm accounts by Ries and his CPA firm.  At Rachel Lee's direction, Raines money moved into these two accounts and out to accounts in the names of Rachel Lee's family and friends.

**GOVERNMENT'S SENTENCING MEMORANDUM**                              **Page 41**

In 2014, Jr. reported that he knew that he and Rachel Lee shared a joint account at Columbia Bank. However, based on a review of the check history, Jr. never signed a single check drawn on this account.

Jr. did not know that Rachel Lee also opened and funded a Rachel Lee only savings account at Columbia bank on the same day. At the time of the search warrants in this case, Rachel Lee's Columbia savings account held $899,580 of Raines family money.

### 2010 and 2011

In 2010, combined checks to Rachel Lee, Blancey Lee and Porsha Lee total $167,927.27. In 2011, combined checks to the three co-defendants from this account only total $127,700.

UBS distributions to the xx6923 account in 2010 and 2011 total $1,039,666.14. In 2011, over $2 million dollars in proceeds from Tree Farm sales are deposited to Tree Farm account xx0314.

### 2012

On August 16, 2012, Rachel Lee opened another joint account with Jr. at Wells Fargo. On July 15, 2013, she opened a Rachel Lee only savings account at Wells Fargo. Rachel Lee funded that account with Raines family money. In 2014, Jr. told agents he did not believe he had any accounts at Wells Fargo bank.

On July 15, 2013, Rachel Lee opened a Rachel Lee only savings account at Wells Fargo bank. Jr. did not know that Rachel Lee opened and funded a Rachel Lee only savings account at Wells Fargo bank. At the time of the search and seizure warrants in this case, Rachel Lee's Wells Fargo savings account held $1,001,388.73 of Raines family money.

By 2012, Rachel Lee's spending is funded solely by Tree Farm property sales.

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 42**

This snapshot of financial activity demonstrates that Rachel Lee exploited her access to the Raines family fortune for the benefit of herself and her family.

### Rachel Lee's Control of the Raines Tree Farm American Express Card

Records related to the issuance and use of Raines Tree Farm American Express Cards also tell the story of Rachel Lee's control of the financial accounts and the financial exploitation of Sr., Jr., and the Tree Farm.

Exhibit 13 details the dates of issuance of Tree Farm American Express cards, the names assigned to the card, and the expenditures associated with each cardholder. Jr. denies any knowledge of the issuance of multiple cards or the use of this card for purposes unrelated to the Tree Farm and reasonable expenses.

Rachel Lee charged approximately $170,000 in purchases to her card after she discontinued the cards of her co-defendants. (Ex. 31) Rachel Lee failed to make final payments on the American Express card. The account, in Jr.'s name, carries an outstanding balance of over $168,000.

### Jr.'s Signature on a Document or Presence at a Transaction Does Not Negate Rachel Lee's Fraud

Jr. signed checks, property sale and purchase documents, vehicle purchase documents, and other documents at Rachel Lee's direction. In each case, Rachel Lee bent Jr.'s will to her own through undue influence. Rachel Lee groomed Jr. to consistently respond to her manipulation and control. In those cases where Jr. accompanied Rachel Lee to a purchase or signing, his actions were never fully informed or voluntary. Jr. never understood the reality of his financial matters. The specter of his trust in Rachel Lee and the dependence that Rachel Lee bred loomed large over every transaction and clouded Jr.'s ability to willingly consent.

For example, based on a review of records, in February of 2012, Jr. purchased a 2012 Mercedes-Benz S-Class with a vehicle price of $137,680. Jr.'s name appears on the registration and title. Jr. signed the credit application and the purchase documents.

Agents interviewed Mercedes-Benz of Portland Sales Consultant Richard Maughan regarding this transaction. Maughan handled the sale and recalled the transaction. Maughan recalled Rachel Lee entering the dealership with two or three women and two small children. Rachel Lee told Maughan she wanted the fully loaded SL550 model on the showroom floor. (Ex. 32) Rachel Lee told Maughan her "husband" would buy the car for her.

Rachel Lee then told Maughan her husband needed a new car. Rachel Lee suggested a SmartCar. Maughan recalls learning the potential owner of the SmartCar lived on a farm. Maughan believed a SmartCar to be an odd choice, and recalled a discussion with Rachel Lee about ground clearance issues with the vehicle on dirt roads.

Rachel Lee filled out a credit application in Jr.'s name with Jr.'s information for the purchase of the Mercedes. Jr. came to the dealership later with Rachel Lee. The credit application shows Rachel Lee listed at Jr.'s closest relative not living with Jr. She lists her relationship with Jr. as "sister." Jr.'s address is listed as 2908 SW Birkendene. (Ex. 32)

Maughan recalled Rachel Lee traded in a 7-seat Mercedes-Benz GL model for the purchase of the SL550. The Mercedes GL was registered to Jr.

Maughan stated that when Jr. came to sign the paperwork for the SL550, Jr. did not talk much. Maughan stated that Rachel Lee controlled the purchase. Maughan believed Rachel Lee "ramrodded" the deal.

Rachel Lee paid the $30,000 down payment with a check drawn on the xx7270 joint account.  The printing on the "Hello Kitty" check bears the name of Rachel Lee only and is signed by Rachel Lee. (Ex. 32)

### C.  The Money Laundering Scheme: Spending the Proceeds of the Fraud

The bank and account information reveals that in 2007 and 2008, Rachel Lee primarily directed the proceeds of the fraud to herself, Blancey Lee, Blancey Lee's father Paul Lee, and to support or supplement the everyday living expenses of her extended family.

During these years, Rachel Lee lived the Birkendene home.  She used Raines account debit cards to pay for her daily expenses – including but not limited to groceries, transportation, dining out, and clothing.  With no out-of-pocket living expenses and a monthly net "salary" of over $17,000 per month, Rachel Lee and her family lived a more than comfortable lifestyle.

In 2009, Rachel Lee begins using Raines funds to support a more lavish lifestyle.  As an example, Exhibit 61 details one month of expenditures from the Tree Farm accounts, joint accounts, and American Express cards in April 2011.

By 2012, Rachel Lee's liquidation of the Raines fortune and lavish spending reaches its pinnacle.   Rachel Lee used the Raines money to fund luxury clothing and jewelry purchases, extensive travel, luxury vehicles, and the acquisition of real property.

#### *Luxury Clothing and Jewelry*

A review of the bank and credit card records reveals extensive luxury clothing, accessory, and jewelry purchases.  Rachel Lee and her family spent the Raines fortune at stores in Las Vegas, Beverly Hills, and Rodeo Drive, among other locations.   This includes high-end purchases at Gucci, Louis Vuitton, Ferragamo, Christian Louboutin, Cartier and Ben Bridge.

Rachel Lee purchased a Rolex watch at the Bellagio hotel on September 14, 2012. This watch cost $63,670.90. Rachel Lee funded this purchase with a wire transfer from her joint Columbia Bank account. Columbia Bank branch employee Heather Dollarhyde recalls Rachel Lee calling the bank to initiate the transfer. Rachel Lee told Dollarhyde she planned to use the funds to purchase a watch for Jr. In fact, Rachel Lee presented this watch to Blancey Lee as a gift. (Ex. 53)

Rachel Lee and Blancey Lee purchased multiple Rolex watches valued between five and ten thousand dollars. Agents seized five Rolex watches during the execution of the search warrant at the Canby Psychic shop and residence. The government did not recover the $63,670.90 watch.

In addition to high end stores in Las Vegas and California, Rachel Lee and her family frequently shopped at Nordstrom. Minimum Lee family Nordstrom expenditures between February of 2008 and March of 2014 total $290,554.47. (Ex. 68) This number only includes direct traceable payments to Nordstrom from the analyzed accounts and credit cards. The annual totals are as follows and illustrate the escalation in spending and fraud over time:

- 2008: $785.28
- 2009: $15,782.92
- 2010: $96,550.32
- 2011: $97,625.98
- 2012: $64,996.90

Jr. claims he never set foot in a Nordstrom as an adult, but once went to the store with his mother. Jr. claimed no knowledge of the use of his money for this purpose.

### Luxury Vehicles

Records reveal payments to Lexus, BMW, Infiniti, and Mercedes over the life of this fraud. The government is unable to determine exactly how many vehicles Rachel Lee and her

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 46**

extended family purchased or leased with the Raines fortune over the course of the fraud and money laundering scheme. A few of the earlier vehicles include:

- A 2008 Mercedes-Benz; titled in the name of Blancey Lee and Porsha Lee; license plate "ALLBIG"
- A 1964 Chevelle; titled in the name of Blancey Lee; license plate "ZMT584"
- A 2011 Ford F-250 crew cab; titled in the name of Blancey Lee; license plate "580RVF"

Raines money funded high-end daily use vehicles for Rachel Lee, Blancey Lee, and their children. In addition to daily use vehicles, Rachel Lee and Blancey Lee purchased collectible and trophy cars.

Rachel Lee and Blancey Lee purchased two luxury vehicles on July 27, 2012 – a 2012 Bentley Mulsanne for $335,695 and a 2013 Ferrari convertible for $226,437. (Ex. 51 and 52) These purchases coincided with the sale of the main Tree Farm plot for more than $8 million dollars.   provide payment detail for these purchases.   They purchased both cars in Blancey Lee's name and Blancey Lee registered both cars in Oregon.  Vanity license plates for the two cards read "MR BIG" and "MR BIG1."

As part of the purchase of the 2012 Bentley Mulsanne, Rachel Lee and Blancey Lee traded in a 2012 Bentley Continental.  Blancey Lee purchased the 2012 Bentley Continental at the same Bentley dealership in Newport Beach California in August of 2011. (Ex.)

Only one of the cars purchased by Rachel Lee and Blancey Lee is also registered in Rachel Lee's name.  That car is a 1955 Chevrolet Bel Air Convertible.  According to Juan Ruiz, the owner of Affordable Classics, Rachel Lee and Blancey Lee purchased this vehicle from him in September of 2012.  The vehicle cost approximately $56,213.  Ruiz recalls that Rachel Lee did most of the negotiating for the purchase.  After negotiating a price, Rachel Lee left the store and returned with a cashier's check for the purchase.  (Ex. 33)

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 47**

### Travel

Bank and credit card records reveal extensive travel by Rachel Lee and her extended family. This travel includes over $100,000 in airfare between June of 2009 and April of 2014. Rachel Lee funded high-roller stays at high-end resorts in Las Vegas including the Bellagio, the Venetian, the Wynn, and others. Traceable trips to Vegas with expenditures are shown at Exhibits 46 and 64.

In the fall of 2013, after stealing over $11 million dollars in Tree Farm proceeds, Rachel Lee and Lee/Marks worked to convince Jr. to sell his last remaining properties. At the same time, Rachel Lee funded a lavish European vacation for herself and Blancey Lee. The expenditure detail is not present in the bank records available to the government. There is a $400,000 withdrawal on August 15, 2013 which may have funded the Europe trip. (Ex. 42)

Digital video seized during the Canby house search warrant documents the trip. The video shows Blancey Lee and Rachel Lee flying first class to Paris and dining at the Eiffel tower. (Ex. 129) From Paris, they continue to Monte Carlo. (Ex. 127) In Monte Carlo, they spend two nights in a hotel that Blancey Lee states costs $1800 per night. Rachel Lee and Blancey Lee gamble in black tie attire at a Monte Carlo casino and visit a nightclub called the Billionaires Club. From Monte Carlo, they continue to luxury stays in Rome, Venice, Florence and Sicily. (Ex. 128)

### Real Property

Between February of 2010 and April of 2013, Rachel Lee purchased eleven properties with the Raines fortune. The combined cost of the properties is approximately $3.8 million dollars. At the time of the search warrants in this case, Rachel Lee and her family still owned ten of those properties. Descriptions of these properties are detailed at Exhibit 69.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 48**

Four of the Oregon properties doubled as Psychic Shops and Lee family residences. Rachel Lee and Blancey Lee utilized six of the properties, either in full or in part, as income generating rentals. Renters at the multiple locations primarily identified Blancey Lee as their landlord. Some renters also identified Rachel Lee as a landlord.

Rachel Lee and Blancey Lee used the Raines fortune to improve and furnish each of these properties. Pictures of the inside of the Canby Psychic shop and Lee home reveal high-end appointments and upgrades in the kitchen, and the living room. The basement level master bedroom includes a large custom his and hers closet, full with luxury clothing, and a large tiled bathroom with a walk-in shower. (Ex. 113, 117-125)

Of the real estate purchased between 2010 and 2013, the Rachel Lee purchased the first two properties with a combination of cash and financing. After that, Rachel Lee and her daughters at her direction paid full cash value at the time of purchase. (Ex. 35)

Rachel Lee's daughter Samantha Lee is the purchaser of record and owner of three of the properties. Based on a review of the purchase documents, Rachel Lee negotiated these sales and signed preliminary purchase related documents. Samantha Lee executed final documents and at times directed purchase payments at her mother's direction. Samantha Lee owned these properties in name only. Rachel Lee exercised control over the properties.

The purchase and ownership history of the Birkendene property is complex at best. A detailed review is presented in exhibit 34. As noted earlier, Jr. deeded Birkendene to Mary Marks for zero consideration in 2010. In 2014, Jr. did not recall that transaction.

Jr. is also the purchaser of record on the Canby Psychic shop and home. In 2014, Jr. told agents he bought this property together with Rachel Lee for investment purposes. Jr. believed he still held an ownership interest in the property. He did not. On September 11, 2013, Jr. deeded

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 49**

the property to Rachel Lee for zero consideration.  When agents showed Jr. this deed, he did not recall the transaction.  Jr. stated that in 2013, he fully trusted Rachel Lee and signed documents at her direction.

### D. The Investigation

In January of 2014, Portland Police Detective Elizabeth Cruthers relayed to Canby Police Detective Steve Floyd her concerns regarding the possibly financial exploitation of Jr. by Rachel Lee, Blancey Lee, Mary Marks, and others.  Detective Floyd opened an investigation (Canby PD case no. 14-0194) and subpoenaed bank records.

Given the complexity of the transactions, Det. Floyd requested the assistance of Internal Revenue Service (IRS) Criminal Agent Cameron Wall.   On March 19, 2014, Det. Floyd and Agent Wall visited Jr. at his home in Gaston.  They spoke with Jr. and their concerns escalated. Based on their review of records and issues raised during their interview with Jr., both agencies sought warrants.  The details of their conversation with Jr. are laid out in the warrant applications.

On March 20, 2014, the Canby Police Department secured a warrant to search the Canby Psychic Shop and residence for evidence of criminal financial exploitation.  On March 21, 2014, IRS agents secured warrants to seize funds in three Rachel Lee bank accounts as proceeds of federal wire fraud.  (Case no. 14-MC-109)  Agent Wall also secured authority to seize the 2013 Ferrari.   Canby Police detectives and IRS agents executed these warrants on March 21, 2014.

Based on the seizure warrants and subsequent investigative information, federal agents seized $1.9 million in currency, the 2013 Ferrari, and the 1955 Bel Air.  Canby Police detectives located, among other items, a computer containing digital pictures and videos, two blond wigs, a

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 50**

deed transferring the Canby property to Rachel Lee from Jr. for zero consideration, and a blank Tree Farm check signed by Jr.

According to attorney Brett Hall, Rachel Lee, through her attorney Adam Dean, retained Brett Hall to represent Jr. in this investigation effective March 21, 2014.   Shortly after, Mr. Hall alerted the government that Jr. wanted to meet with the government to share Jr.'s position on the case.

Government agents met with Jr. and attorney Brett Hall on March 25, 2014.  Agents began the conversation by asking Jr. questions about himself and his spending habits.  Jr. repeatedly stopped the conversation and interjected "Can we talk about Rachel now?"  Jr. told agents that he had gifted Rachel Lee four million dollars.  He also told agents he did not have a wife or a child.  These statements were in direct conflict with the statements Jr. made to agents on March 19, 2014.

 Agents anticipated Jr. would attempt to cover up and excuse Rachel Lee's financial exploitation.  Agents presented Jr. with an overview of Rachel Lee's expenditures in Las Vegas, on jewelry, on vehicles, and on property.  Agents also shared information regarding direct payments Rachel Lee made to Blancey Lee, Paul Lee, and other Lee family members.  After the review, Jr. noted "I think we have a problem here."

Jr. later told agents and that he and Rachel Lee discussed the story he was to relay to agents.  After the meeting with agents, he returned to the Marriott waterfront hotel where Rachel Lee waited for him.

The government continued to pursue a criminal case against Rachel Lee and her codefendants, despite Jr.'s "explanation" of Rachel Lee's expenditures and her role in his life.

**GOVERNMENT'S SENTENCING MEMORANDUM**                              **Page 51**

At his client's direction, Brett Hall provided the government with a letter written by Jr. dated May 2, 2014.  (Ex. 36)  The letter begins "I'm not a victim" (sic).  In the letter Jr. states that he gave Rachel Lee all the money at issue and he is "behind Rachel 100%!"  The letter ends by stating "I will not press charges on no one!!! I just want all of this stopped."  In an attached cover letter, Jr. tells his attorney "Make sure the Prosecutor gets a copy of this statement."

In a later interview with agents, Jr. stated he wrote this letter at Rachel Lee's direction. Jr. added that he wrote multiple versions of this letter at Rachel Lee's direction.  According to Jr., Rachel Lee ripped up earlier versions of the letter until Jr. produced a final version that met Rachel Lee's approval.

On May 8, 2014, agents arrested Rachel Lee and Porsha Lee in Bend, Oregon at the Psychic shop.  At the time of arrest, Rachel Lee and Porsha Lee were in the process of leaving town.  Bags packed at the door, Rachel Lee and Porsha Lee swapped their usual iPhones for phones that could not easily be tracked or traced to them.  When agents arrested Porsha Lee, they found $36,450 in cash in three envelopes in her underwear.

Rachel Lee asked agents to return Jr.'s car keys and phone to him, which she had in her possession.  Rachel Lee told agents she removed the car keys from the back house that morning without Jr.'s knowledge.  Rachel Lee told agents Jr. would not know where to look for his keys and phone.

At Rachel Lee's direction, Jr. picked up a rental car days before their trip to Bend. Rachel Lee and Jr. left the SmartCar and the Mercury Mariner Jr. regularly drove in a parking garage near the Lloyd Center mall and the Broadway house.   Later, Jr. did not recall the location of these vehicles.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 52**

Agents found Jr. in the unattached apartment behind the house.  He appeared disheveled. Jr. did not recognize Agent Wall despite Jr.'s two prior meetings with Agent Wall.   Jr. stated he had developed health issues and Rachel Lee was now his caretaker.  Jr. later told agents Rachel Lee invited him to travel with her to Area 51 in Nevada, a place that fascinated Jr. for many years.  The arrival of IRS agents with arrest warrants interrupted whatever plan Rachel Lee intended to carry out that day.

**E. Assets Under Jr.'s Control At the End of the Scheme**

By the time of Rachel and Porsha Lee's arrest, little remained of the once vast Raines estate.  Rachel Lee left Jr. with approximately $205,000 in bank accounts under his control and within his knowledge.  No money remained in Jr.'s investments accounts.  (Ex. 66 and 67)

Rachel Lee sold the main Tree Farm plot in 2012 to Merrill & Ring, a company that clear-cut most of Sr.'s beloved forest.   Luckily, the last two remnants of the Tree Farm properties – the A-frame and the old Lee house – did not sell after Rachel Lee and Lee/Marks placed them on the market on January 1, 2014.

Rachel Lee executed a complex and manipulative fraud scheme over a period of a decade.  Rachel Lee, Porsha Lee and Blancey Lee depleted the wealth amassed by Sr. which rightfully belonged to Jr.  Despite the complexity of the fraud, as the Court earlier noted, this case can be summarized in one simple and concise sentence – Jr. visited a fortune teller, and as a result, lost his fortune.

**IV.    THE GOVERNMENT'S SENTENCING GUIDELINE CALCULATION**

The government agrees with the U.S. Probation Office's calculation of the advisory guideline range in this case, resulting in a total offense level of 33.  Pursuant to the terms of the

plea agreement in this case, and consistent with the facts of this case, the United States makes the following recommendations regarding the appropriate guideline calculation:

- <u>Base Offense Level</u>:  Counts 1 and 13 are grouped for guideline calculation purposes.  U.S.S.G. § 3D1.2(b) and § 3D1.2(c).  Pursuant to U.S.S.G. §§ 2B1.1(a)(1)(A) and 2S1.1(a)(1), the base offense level is 7.

- <u>Loss</u>: Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), and the terms of the plea agreement, defendant's offense level is increased by twenty (20) levels because the loss exceeds $7 million dollars but is less than $20 million dollars.

- <u>Specific Offense Characteristics</u>: A one level increase under U.S.S.G. § 2S1.1(b)(2)(A) is required because the underlying statute for the money laundering conspiracy is 18 U.S.C. § 1957.

- <u>Adjustment for Abuse of Position of Trust</u>:  The Court should apply a two level adjustment pursuant to U.S.S.G. § 3B1.3 for Rachel Lee's abuse of a position of trust.

- <u>Adjustment for Organizer Leader Role in the Offense</u>:  The Court should apply a four  level adjustment for Rachel Lee's aggravating organizer or leader role in the offense under U.S.S.G. §3B1.1(a).

- <u>Adjustment for Obstruction of Justice</u>: The Court should apply a two level adjustment pursuant to U.S.S.G. §3C1.1 for Rachel Lee's willful obstruction of justice with respect to the investigation of the instant offense.

- <u>Acceptance of Responsibility</u>:  Pursuant to § 3E1.1(a) and (b), and pursuant to the terms of the plea agreement in this case, the offense level should be reduced by three levels for defendant's acceptance of responsibility.

- Base Offense Level for Failure to File Taxes:  Pursuant to U.S.S.G. § 2T1.1(a)(1), § 2T1.1(c)(2), and § 2T4.1(E), the base offense level for count 14 is 14.  Because the adjusted base offense level for Courts 1 and 13 is greater, the combined adjusted offense level of 36 applies.

- Total offense level:  Based on the factors listed above, the total offense level is 33.

- Criminal History:  The government agrees that the defendant has no prior criminal convictions, and therefore the Criminal History Category for this case is I.

## V.    THE APPROPRIATE STANDARD OF PROOF

The government bears the burden of proof on the facts underlying a sentencing enhancement. *United States v. Ameline,* 409 F.3d 1073, 1086 (9th Cir. 2005).  A district court's findings of fact at sentencing, including those used in calculating the loss amount, must be supported by a preponderance of the evidence. *United States v. Armstead,* 552 F.3d 769, 776 (9th Cir. 2008).  When a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, the burden may be heightened to require clear and convincing evidence, if the enhancement is based on uncharged or acquitted conduct, to ensure that a defendant receives adequate due process. *United States v. Jenkins,* 633 F.3d 788, 808, 809 n. 9 (9th Cir. 2011); *United States v. Treadwell,* 593 F.3d 990, 1000 (9th Cir. 2010); *United States v. Zolp,* 479 F.3d 715, 718 (9th Cir. 2007).

Whether a sentencing enhancement causes a disproportionate impact warranting this heightened standard is determined by the totality of the circumstances. *United States v. Treadwell,* 593 F.3d at 1000 (identifying six factors courts consider in the "totality of the circumstances" analysis).  However, the Ninth Circuit has held that sentencing determinations

relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence. *Id.,* at 1001; *See also United States v. Berger,* 587 F.3d 1038, 1047-49 (9th Cir. 2009) (stating that a number of cases involving a defendant's fraudulent conduct, where the sentencing facts for the fraud enhancement are based on the extent of the conspiracy, held that facts underlying the disputed enhancements need only be found by a preponderance of the evidence). Enhancements based on the extent of a conspiracy are on a "fundamentally different plane" than enhancements based on uncharged or acquitted conduct, and can be established by a preponderance of the evidence. *Armstead,* 552 F.3d at 777.

Here, the enhancement for loss under § 2B1.1 (b)(2), is based on the extent of the defendant's guilty plea to the conspiracy count. There are no due process concerns here, because in applying the loss enhancement the Court would be determining the extent of the conspiracy, not the extent of any uncharged or acquitted conduct.

Pursuant to the plea agreement, defendant Rachel Lee stipulated to a loss amount in excess of $7 million dollars and agreed not to contest that amount.   The parties did not agree to a restitution amount and leave that determination to the Court based on the presentation of evidence and relevant law.

The government believes that the applicable standard of proof is a preponderance of the evidence.  The government will meet the burden of proof at sentencing by: (1) presenting testimony from federal law enforcement agents other witnesses with knowledge of the defendant's conduct where appropriate and necessary; (2) introducing evidence, including documents associated with the defendant's fraudulent conduct, pictures, and video; and (3) introducing into evidence summary charts showing losses for sentencing purposes, proof of money laundering, and losses for restitution purposes.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                            **Page 56**

## VI.     THE USE OF HEARSAY AND OTHER ADMISSIBLE EVIDENCE

The Ninth Circuit has held that hearsay is admissible at sentencing as long as it is accompanied by some minimal indicia of reliability. *United States v. Littlesun*, 444 F.3d, 1196, 1201 (9th Cir. 2006) (remanded on other grounds) (citing *Williams v. New York*, 337 U.S. 241, 246 (1949)). Title 18, U.S.C. § 3661 and Fed. R. Evid. 1101(d)(3) also provide that the hearsay rule and other evidentiary limitations do not apply to sentencing hearings.

At sentencing, the district court has at its disposal "a wide variety of information that could not be considered at trial." *United States v. Messer*, 785 F.2d 832, 834 (9th Cir. 1986).   A Among other reliable sources, a district court may rely on uncontradicted witness statements contained in investigative reports and other documents. *United States v. Houston*, 217 F.3d 1204, 1207 (9th Cir. 2000).

## VII.     ADJUSTMENTS

### A.  Aggravating Role in the Offense

The government agrees with the U.S. Probation Office that a four level increase pursuant to U.S.S.G. § 3B1.1(a) applies because defendant organized and led criminal conduct that involved five or more participants or was otherwise extensive.  Section 3B1.1(a) of the Guidelines provides:

Based on a defendant's role in the offense, increase the offense level as follows:

(a)  If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b)  If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c)  If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Section 3B1.1(a) applies in two instances, only one of which requires the district court to identify five or more participants. A court may enhance a sentence without identifying five or more participants if the court finds by a preponderance of the evidence that the criminal activity was otherwise extensive, and that there were one or more participants over whom the defendant exercised organizational or leadership control. *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 96 (1994); *United States v. Luca*, 183 F.3d 1018, 1024 (9th Cir. 1999). *See also* Section 3B1.1, cmt. n. 2.

A "participant" is defined as "a person who is criminally responsible for the commission of the offense," although the person need not be convicted of the offense to qualify. U.S.S.G. § 3B1.1 cmt. n. 1. Courts uniformly count as "participants" those who were aware of the activity and knowingly assisted. *United States v. Cypher*, 130 F.3d 1361, 1363 (9th Cir. 1997). In this way, the definition of "participant" is broader than conspiratorial liability. *Id.* An unwitting person is not a participant even if they assisted the criminal enterprise, because they ordinarily bear no criminal responsibility. *United States v. King*, 258 F.3d 971, 977 (9th Cir. 2001). The defendant is a participant for purposes of determining the number of participants under § 3B1.1. *United States v. Atkinson,* 966 F.2d 1270, 1276-77 (9th Cir. 1992).

In determining whether the Aggravating Role enhancement applies, courts consider the defendant's role in all relevant conduct, as defined by U.S.S.G. § 1B1.3; not solely the defendant's role in the offense of conviction. *Cypher*, 130 F.3d at 1363. An offense may have more than one organizer or leader, and imposition of the enhancement as to one defendant does not preclude its imposition as to a co-defendant. *Barnes*, 993 F.2d at 685. *See also* Section 3B1.1, cmt. n. 4.

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 58**

To sustain a finding that a defendant was an organizer or leader, there must be evidence that the defendant exercised some control over others in the commission of the offense or was responsible for organizing others for the purpose of carrying out the crime.  *United States v. Avila,* 95 F.3d 887,889 (9th Cir. 1996)(internal quotations omitted).  Factors to consider may include: (1) the exercise of decision-making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning and organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1 cmt. n. 4 (providing this "non-exhaustive list" of factors to consider).  *See also United States v. Berry*, 258 F.3d 971, 977 (9th Cir. 2001).

When the criminal activity in question does not involve five or more participants, the four (4) level adjustment applies if the defendant was an organizer or leader and the criminal activity was "otherwise extensive."  To make that determination, courts consider: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendants with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme."  *Berry*, 258 F.3d at 977.  All persons involved during the course of the entire offense are to be considered, including unwitting outsiders used by the defendant. U.S.S.G. § 3B1.1 cmt. n. 1.  *See, United States v. Lueng*, 35 F.3d 1402, 1405-07 (9th Cir. 1994).

A preponderance of the evidence shows that defendant was an organizer or leader of an otherwise extensive scheme.  Rachel Lee exercised primary decision making in this scheme.  Only Rachel Lee controlled the bank accounts and information communicated to the CPA regarding the Raines finances.  Only Rachel Lee held Power of Attorney over Jr.  Rachel Lee

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 59**

planned and organized this entire offense.  Rachel Lee is the one common denominator in every

step taken to defraud Jr. and spend the Raines fortune.  She served as the gateway for every

dollar stolen from Jr. and the Raines estate.

Rachel Lee recruited others to assist in the commission of this offense.  Rachel Lee

recruited and used her daughter Porsha Lee to play the role of Jr.'s fictional bookkeeper,

personal assistant, wife and mother of his child.  Rachel Lee used her mother and her mother's

name to open bank accounts and transfer property under Rachel Lee's control.   Rachel Lee

recruited her daughter Samantha Lee to sign purchase documents for three properties, including a

$1.1 million dollar apartment complex.  Rachel Lee recruited her daughter Pebbles Lee to allow

her son to play a central role in the promotion of this fraud scheme.   Rachel Lee used her

grandson, Giorgio Armani, as an accomplice in this fraud scheme.  She shamelessly trained little

Giorgio to sit on Jr.'s lap, hold his hand, and call him "dada."

At the end of this fraud scheme, Rachel Lee claimed a right to the largest share of the

fruits of this crime.  In May of 2014, Rachel Lee held nearly $2.5 million in cash in accounts in

her name only.  Of the 10 homes purchased with proceeds of this fraud, Rachel Lee held one in

her name only, five jointly with Blancey Lee, and controlled 3 properties solely in the name of

her young daughter, Samantha Lee.

This activity is otherwise extensive for purposes of the enhancement.  Rachel Lee's

daughter Porsha Lee knowingly participated in this scheme.  Samantha Lee knew about the

Lee/Marks persona and purchased properties at her mother's direction.

The primary unknowing participants in this case are attorney Michael Moore and his

staff, CPA Russ Ries and his staff, and relator Pat Griffith.   Their services were "peculiar and

necessary" to the criminal scheme.   Under the alleged protection of their professional oversight,

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 60**

she manipulated and used their skills to effectuate her theft of the Raines fortune.   The CPA firm taught Rachel Lee and Porsha Lee to use QuickBooks, allowing them to cover their tracks and keeping Jr. from retaining a real bookkeeper.   Rachel Lee used the attorney to prepare and notarize a durable Power of Attorney, and make her Jr.'s attorney-in-fact.   Michael Moore prepared a will for Jr. naming Rachel Lee his personal representative and granting her all of his property and assets.   Finally, Rachel Lee used the realtor's services to sell the Tree Farm, dismantling the homestead and sustainable forest Sr. meant to maintain.

Therefore, Rachel Lee was an organizer or leader of an otherwise extensive scheme and the four-level increase for Aggravating Role in the offense applies.

### B.  Abuse of Position of Trust

The government agrees with the U.S. Probation Office that a two level increase pursuant to U.S.S.G. § 3B1.3 applies to defendant because she abused a position of private trust.  A position of private trust under the Guidelines is characterized by the type of professional or managerial discretion ordinarily given considerable deference.  U.S.S.G. § 3B1.3 cmt. n. 1.  The enhancement addresses the fact that persons holding positions of trust are subject to significantly less supervision than employees with non-discretionary duties.  *Id.*   For the adjustment to apply, the position of trust must facilitate the commission or concealment of the offense, i.e. by making the detection of the offense or the defendant's responsibility for the offense more difficult.  *Id.*

The enhancement also applies when a defendant provides sufficient indicia to a victim that the defendant legitimately holds a position of private trust when, in fact, they do not.  U.S.S.G. § 3B1.3 cmt. n. 3.  The Guidelines provide as examples a financial fraudster duping a wealthy investor into believing that the fraudster is a legitimate investment broker, and the embezzlement of a client's funds by an attorney serving as guardian. *See id.*  The adjustment is

**GOVERNMENT'S SENTENCING MEMORANDUM**                                   **Page 61**

appropriate in such cases because the misrepresentation allows the defendant to assume a position of trust relative to the victim, providing the same opportunity to commit a difficult-to-detect crime as someone would have had if the position were held legitimately.

The Abuse of Trust enhancement applies to defendant.   As a hired home care worker for Sr., and later as Jr.'s bookkeeper and best friend, Rachel Lee held a position of personal trust relative to the victim.  With Power of Attorney over Jr., Rachel Lee assumed a legal duty to act in the victim's best interests.   Throughout the fraud, Jr. ceded control and deferred to Rachel Lee based on her assertions that she acted with his best interests in mind.  Rachel Lee created the character Mary Marks and injected Lee/Marks as Jr.'s wife in part to gain full operational and financial control of the Tree Farm and to sell the Tree Farm.

Rachel Lee carefully crafted each of these roles for herself and her daughter to facilitate the commission or concealment of the offense.  The fact that Rachel Lee served as the main conduit between Jr. and the CPA firm, Jr. and the relator, and Jr. and the banks, made the offense itself and the defendant's responsibility for the offense more difficult to detect.  None of the professionals who dealt with Rachel Lee on behalf of Sr. ever raised concerns sufficient to stop or even stall Rachel Lee's illegal conduct.   She not only fooled Jr., she fooled the professionals by feeding them misinformation and lies to cover her fraudulent conduct.

Therefore, the two level increase for abuse of position of private trust applies.

## C.  Obstruction of Justice

The government agrees with the U.S. Probation Office that a two level increase pursuant to U.S.S.G. § 3C1.1 applies to defendant because she obstructed or impeded the administration of justice.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 62**

Section 3C1.1 of the Guidelines provides:

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct of impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. "The conduct to which this adjustment applies is not subject to precise definition," but Application Note 4 to USSG § 3C1.1 sets forth a non-exhaustive list of examples of the types of conduct to which this enhancement applies. *Id*. at cmt. n. 3. As relevant here:

(A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so; and

(C) producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding.

*Id*. An obstruction adjustment applies based on the defendant's own conduct and that which she aided or abetted, counseled, commanded, induced, procured, or willfully caused. USSG 3C1.1 cmt. n. 9. The success with which the defendant acted is immaterial; it is sufficient that the conduct in question has the potential for obstructing the investigation, prosecution, or sentencing of the instant offense. *United States v. Draper,* 996 F.2d 982, 986 (9th Cir. 1993)(citation omitted).

Here, the adjustment applies because Rachel Lee influenced Jr. - a key witness to her criminal activity - in an effort to obstruct the investigation and impending prosecution against her. Rachel Lee caused Jr. to generate a false statement of fact with the specific purpose of obstructing the investigation.

After Rachel Lee learned of the criminal investigation in March of 2014, she convinced to lie to investigators. As relayed in the statement of fact above, on April 25, 2014, Jr. told

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 63**

investigators that he "gifted" Rachel Lee $4 million dollars and ratified her conduct. When the government continued its investigation, Rachel Lee directed Jr. to draft and re-draft a hand-written letter to the prosecutor. Ripe with false statements, Rachel Lee directed Jr. to write the letter in hopes of stopping or undermining the criminal investigation into her actions. The enhancement applies because the defendant influenced a key witness to obstruct the investigation by producing or attempting to produce a false document during an official investigation. U.S.S.G. § 3C1.1 cmt. n. 4(C).

The obstruction enhancement also applies based on the defendant's attempt to flee the jurisdiction with Jr. during the investigation. Prior their May 8, 2014, arrest, defendant and Porsha Lee traveled to Bend with Jr. and told him they were going on an a trip out of state. Agents arrived at the Bend Psychic Shop just as defendant was poised to depart; suitcases packed and staged the door, disposable cell phones in hand, and over $36,000 cash in Porsha's underwear.

During the arrest, agents located Jr. in the back attached living area - disoriented, disheveled, and unable to recognize the IRS agent who previously interviewed Jr. at length. The victim told the agents that the defendants and he planned to travel out of state. Jr. later told agents that Rachel Lee voiced concerns about the investigation and the possibility of law enforcement intervention. The obstruction enhancement also applies to the defendant's attempt to remove herself and the victim from the jurisdiction and out of reach of investigators during the pendency of the investigation.

**VIII.        § 3553(a) FACTORS**

While no longer bound by the Sentencing Guidelines, courts must first consult the guidelines and take them into account at sentencing. *United States v. Booker*, 543 U.S. 220,

**GOVERNMENT'S SENTENCING MEMORANDUM**                                      **Page 64**

125 S. Ct. 738, 767 (2005).   Even though the guidelines are advisory, they remain influential in

an effort to ensure nationwide consistency in sentencing. *Gall v. United States*, 128 S. Ct. 586,

596 (2007) ("to secure nationwide consistency, the guidelines should be the starting point and

initial benchmark" for sentencing); see also *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th

Cir. 2006) ("[The] continuing duty of district courts to consult the guidelines is statutory").

After the parties are given a chance to argue for a sentence they believe is appropriate,

the Court should consider the factors under 18 U.S.C. § 3553(a) and decide whether they support

the sentence advocated by the parties. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008)

(citing Gall, 128 S. Ct. at 596-97 n.6). The Court must then make an individualized sentencing

determination based upon the facts. *Id.* The guidelines should not be given more weight or less

weight than the other § 3553(a) factors. *Id.* If the Court decides a non-guideline sentence is

warranted, the Court must ensure the justification is sufficiently compelling to support the

degree of variance. *Id.* Once a sentence is selected, the Court must explain its rationale

sufficiently to permit meaningful appellate review. *Id. at 992.*

Factors to consider under 18 U.S.C. § 3553(a) include the nature and circumstances of

the offense; the history and characteristics of the defendant; the need for the sentence imposed to

reflect the seriousness of the offense; the need for the sentence to promote respect for the law;

the need for the sentence to provide just punishment for the offense; the need for the sentence to

afford adequate deterrence to criminal conduct; the need for the sentence to protect the public

from further crimes of the defendant; and the need to provide the defendant with needed

training, care, or treatment.

## A.  Nature and Circumstances of the Offense

The nature and circumstances of defendant's crime are set forth in detail in the government's Statement of Facts above.

## B.  History and Characteristics of the Defendant

Rachel Lee's history demonstrates that she is a financial predator.  She carefully selects her clients through her Psychic Shops and grooms them over time with promises of companionship.  Once the target trusts Rachel Lee, she uses that trust to steal from her victim and extract the maximum amount possible.

Rachel Lee's financial exploitation of Jr. is no accident of circumstance.  Her pattern is clear.  Jr.'s victimization differs only in the size, scope, and complexity of the fraud scheme and the loss.

### *Financial Exploitation of B.T.*

The first documented police report regarding Rachel Lee and financial exploitation in the government's possession involves victim B.T.  According to police reports, a man referred to herein as B.T. met Rachel Lee when he visited Psychic World in Sacramento in 1999.  (Sacramento Police Department, Report No. 03-60740).   A friend described B.T. to the police as "kind of slow."   B.T. told police that he and Rachel Lee met a few more times and a friendship developed.  B.T. stated he trusted Rachel Lee.  Soon thereafter, Rachel Lee told B.T. that her husband was divorcing her and she needed a car.  At Rachel Lee's request, B.T. co-signed on a car loan for defendant.

B.T. claimed Rachel Lee said she lived with her "brother" Barney.  B.T. continued to loan Rachel Lee money at her request due to various hardships.  Also at her request, he added her

name to his credit cards.  B.T. claimed to officers that Rachel Lee promised to use the cards only for small amounts, and he trusted her.

B.T.'s financial assistance to defendant ultimately totaled over $85,000.   Despite Rachel Lee's promises of repayment, B.T. never received any money from defendant.  B.T. later discovered credit cards opened in his name, during the relevant time frame, without his approval or prior knowledge.

B.T. sued defendant, as "Rachel Lee, aka Pebbles Lee," in Sacramento Superior Court case number 05AS05624.  In January 2010, after defendant failed to appear for trial, the court entered a default judgment against Rachel Lee.  The court awarded B.T. a total of $1,053,945.98, including general and punitive damages and other costs.

### Financial Exploitation of N.J.

In March 2014, agents interviewed N.J., an older man who stated he had met the defendant at her Psychic Shop in Canby about nine weeks earlier.  N.J. told agents that he was working toward marriage with Rachel Lee and already purchased wedding rings.  N.J. told officers that Rachel Lee introduced him to her daughter Pebbles and that he frequently spoke with Pebbles.

N.J. told agents he offered to help Rachel Lee obtain another vehicle after Rachel Lee told him the monthly lease on her SmartCar would soon expire.  On March 15, 2014, N.J. leased a $120,000 Mercedes in his name for Rachel Lee to drive.  N.J. claims Rachel Lee stated she could fund the lease with money she earned from three rentals she owned: a second home on her Canby property, a property in Bend, and another property in Gaston.  N.J. worked as a school custodian and could not service this monthly Mercedes lease.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 67**

A co-worker of N.J.'s contacted agents.  In a fashion that is disturbingly similar to Jr. , she described  N.J. as a simple, lonely man in his late sixties who lived alone for approximately 40 years.  Also disturbingly similar, N.J. lives by himself on 20 acres of wooded timber property worth approximately $4 million dollars.

### Financial Exploitation: Similar Crime

Rachel Lee is not the only member of her family to engage in this type of predatory behavior.   In 2008, during the same timeframe Rachel Lee engaged in the instant offense, the Sacramento County District Attorney's office charged Rachel Lee's sister Ruby Marks (a.k.a. Ruby Miller, a.k.a. Ruby Lee) in a twenty-one count complaint.  The complaint alleges crimes including bank fraud, perjury, theft, identity theft, forgery, failure to file state income tax, and embezzlement of $618,273.77 in property belonging to an elder. *People v. Ruby Miller*, Sacramento Case number 08F01099.   The complaint also alleges the unlawful theft of the elder's home.

According to police reports, the charges arose from allegations that Ruby Lee defrauded an elderly man from 2002 to 2008 while acting under the guise of serving as his care-taker. *Sacramento Police Report 08-11723.*   The 90 year-old victim told police that Ruby Lee followed him home claiming to return a dollar he dropped.  Soon thereafter, Ruby Lee and her daughter moved in and agreed to provide care to him for a monthly stipend.  According to the victim, Ruby Lee suggested the victim give her power of attorney and add her to his bank account.  He did both.  According to the report, by the time officers interviewed the victim in a care facility in January of 2008, officers confirmed that Ruby Lee sold the victim's house, sold all his possessions, cashed out his certificate of deposits, and left him with just over $500 in his bank accounts.

Ruby Lee pleaded guilty and received a sentence of 8 years in prison.  Released early in 2011, Ruby Lee moved to Oregon and is associated with psychic shops in Salem and St. Helens, Oregon.  Defendant Rachel Lee's name also appeared on billing paperwork related to the St. Helens Psychic Shop seized during this investigation.

Agents located paperwork related to Ruby Lee's case in a suitcase in the Canby property. That paperwork included the charging document and court document that included a fact summary of the investigation.   Rachel Lee knew about her sister's criminal activity and knew about her sister's conviction and sentence and 2008.  Despite that, in 2008 Rachel Lee escalated her exploitation of Jr.

These examples illustrate that the fraudulent activity Rachel Lee engaged in during the instant case is not an isolated incident.  It is a business model with a specific playbook. Defendant carefully honed that playbook over the years and adopted this model to support herself and her family members at the expense of the weak and the lonely.  She is a predator.

**C. A Below Guidelines Sentence of 108 Months Promotes Respect for the Law, Provides Just Punishment for the Offense, and Supports General and Specific Deterrence**

A 108 month sentence recommended by the United States and the U.S. Probation office will appropriately promote respect for the law, provide just punishment for the offense, and meet the goals of specific and general deterrence of future crimes.

In addition to meeting the goals of § 3553, resolving these cases via a 108 month sentence and plea agreement protects the victim by returning  assets to his conservator for his care as soon as practical.

Despite her history of financial exploitation, this crime marks the first time Rachel Lee will be held accountable by a court of law and sentenced to prison.  A nine year federal sentence

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 69**

ensures Rachel Lee will not financially victimize the next lonely man who walks through her

Psychic Shop door.

This sentence also sends a strong message to other "sweetheart swindlers." Despite the

challenges inherent in the investigation and prosecution of these offenses, these cases will be

worked and justice sought for victims of undue influence.

## IX.    FORFEITURE AND RESTITUTION

Criminal forfeiture and restitution are two separate components of a defendant's

sentence. Both are mandatory upon conviction, and each serves a different purpose. Forfeiture

serves as an additional punishment to a defendant, and the amount of forfeiture is based upon the

total amount obtained from or involved in the defendant's crimes of conviction. Forfeiture takes

the profit out of crime, disrupts organizations, lessens their economic influence, and serves as a

deterrent. *United States v. Ursery*, 518 U.S. 267, 291 (1996) (forfeiture "serves the additional

nonpunitive goal of ensuring that persons do not profit from their illegal acts").

Restitution, on the other hand, serves the purpose of making a victim whole by restoring

to the victim the value of the losses suffered as a result of the defendant's crimes. *United States

v. Newman*, 659 F. 3d 1235, 1241 (9th Cir. 2011). The amount of the loss suffered by a victim in

a particular case can and often is different from the amount to be forfeited by the defendant. The

district court may not reduce forfeiture because of an order of restitution to a victim. *Id*. The

Ninth Circuit has specifically held that even when a defendant must pay both restitution and

criminal forfeiture, that result is not an impermissible "double recovery." *Id.* As described

below, the government is seeking both forfeiture and restitution in this case.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 70**

### A. Forfeiture

Pursuant to defendant's plea agreement, defendant forfeits all right, title, and interest in an to all assets subject to forfeiture under 18 U.S.C. 981(a)(1)(C), 982(a)(1)-(2), 21 U.S.C. 853(p), and 28 U.S.C. 2461(c).  This includes all assets listed in the Third Amended Bill of Particulars.   Defendant admits that these assets constituted or were derived from proceeds traceable to her wire fraud and money laundering convictions.

In most forfeiture cases the forfeited items are retained by the government.  In this case, the government arranged for the forfeited cash and proceeds to be directed to the victim. Therefore, the value of the items listed in the Third Amended Bill of Particulars, once forfeited will be transferred to the victim's conservator.

### B. Restitution: Request for Separate Restitution Hearing for All Three Codefendants

Section 3663A(a)(2) of the Mandatory Victims Restitution Act (MVRA), defines a victim as "a person directly and proximately harmed as a result of the commission of an offense." "Restitution seeks to compensate the victim for all the direct and proximate losses resulting from the defendant's conduct, not only for the reasonable foreseeable losses." *United States v. Gossi,* 608 F.3d 574, 581 (9th Cir. 2010).  The purpose of restitution is to put the victim back in the position he would have been but for the defendant's criminal conduct.  *Id.*, at 581.  The goal of restitution under the MVRA is to make the victim whole.  Consequently, any award is limited to the victim's "actual losses." *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1165-66 (9th Cir. 2010).

The district court is not required to conduct a "full-blown adversarial hearing" or a "second trial" on the issue of restitution.  *U.S. v. Cloud*, 872 F.2d 846, 855 n.11 (9th Cir. 1989)  . All that is required is some form of adversarial proceeding where the parties are given the

opportunity to make arguments and the defendant is permitted to dispute the proposed amount of restitution. *Id*.

The district court must resolve disputes by the preponderance of evidence standard, and must provide an explanation of its determination of the restitution amount that is supported by the record. 18 U.S.C. § 3664(e); *United States v. Tsosie*, 639 F.3d 1213, 1221 (9th Cir. 2011). Furthermore, the evidence supporting the restitution order must be specific and reliable. *Id*. at 1222-23 (unauthenticated spreadsheet lacking specific explanation for claimed restitution amount insufficient).

For purposes of this case, Jr. is the person directly and proximately harmed as a result of defendant's crimes. A restitution order cannot put the victim back in the position he would have been but for the defendants' criminal conduct – his Tree Farm is sold, the timber is cut, and the emotional cost of the fraud rivals the economic devastation. At best, a restitution award in this case will accurately reflect his financial losses.

The government is aware the defendant objects to the government's proposed restitution number and analysis. To date, defendant has not clarified her objection or provided a counter analysis. Therefore, the government cannot analyze whatever evidentiary or substantive information may support defendant's position.

In arriving at a restitution amount, a dollar for dollar accounting of the funds defendants stole is impossible. For years, defendants misdirected cash withdrawals and used debit and credit cards at will. Determining whether defendant, her family members, or the victim purchased gas, groceries, or other related items on any given day is impractical. The government can establish that Jr. and Sr. lived very modestly with limited everyday expenditures and without

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 72**

expenditures directed to non-work related travel or luxury items both before and during the defendants' criminal conduct.

The government can establish that Rachel Lee depleted the Raines family fortune between 2007 and 2014. That income came from three sources: 1) timber proceeds, 2) investment account distributions, and 3) sales of the Tree Farm properties. (Ex. 22)

The government can also establish the assets that remained under Jr.'s control as of May 31, 2014, which marks the end of the fraud conspiracy.

The government believes Rachel Lee stole the entire liquidated Raines family fortune, minus three categories of funds:

- reasonable monthly personal expenses for Rachel Lee (pursuant to her agreement with Jr.) reasonable expenses for Jr. and Sr.;
- a generous proportion of expenses from xx6923 attributed to Jr. and Sr.; and
- funds left under Jr.'s control as of May 31, 2014.

The government will provide testimony at the sentencing hearing in support of this analysis and the related summary spreadsheets. This restitution and loss amount is sufficiently specific and reliable, is limited to actual losses, and totals $15,490,978.65. The victim's attorney and conservator concur with the government's analysis.

Two issues complicate the entry of an order of restitution at the time of Rachel Lee's sentencing. First, as the Court recalls, the co-defendants are joined in a single indictment and charged with conspiracy counts. The government plans to seek a total restitution amount attributable to Rachel Lee, with lesser joint and several restitution amounts from co-defendants Porsha Lee and Blancey Lee. As a result, co-defendants Porsha Lee and Blancey Lee may wish to dispute the government's proposed restitution amount and make argument. Conducting a single, streamlined restitution hearing as to all three defendants may best serve the Court and the

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 73**

victim in this case.  A single restitution hearing will eliminate the inherent inefficiencies present

if the Court holds three restitution hearings regarding the same facts and analysis.

Second, the Court may wish to make findings regarding the value of the offsets to

restitution at the time of the restitution hearing.  As part of the plea negotiations, defendants

Porsha Lee and Blancey Lee returned cash to Jr.'s conservator.  Rachel Lee, Blancey Lee, and

Samantha Lee transferred ownership of the ten remaining real properties purchased with the

victim's wealth.  Blancey Lee and Rachel Lee transferred ownership of vehicles to the

conservator.

A full accounting and valuation of these items is not possible at the February 19, 2014

sentencing hearing.  The victim's conservator is unable to attend the hearing.  At later date, the

victim's conservator could provide sufficient and reliable information to the Court as a basis for

the offsets and the Court's related findings.  The government anticipates all three defendants may

wish to litigate issues related to valuations, particularly of the real property and the effect of the

cost of liquidation of the assets on the offsets and the final restitution order.

The Court need not enter a final restitution order at the time of sentencing.  To comply

with the MVRA, the Court must set a date for the final determination of restitution, not to exceed

90 days after sentencing.  Title 18 U.S.C. 3664 (d)(5).  Because the provisions of MVRA are

designed to protect victims, not defendants, the failure to strictly comply with the statute's

procedural requirements is harmless absent actual prejudice to the defendant.  *United States v.*

*Moreland*, 509 F.3d 1201, 1224-25 (9th Cir. 2007) (failure to comply with 90-day time limit

after sentencing for determining amount of restitution was not prejudicial to defendant).   In

*Dolan v. United States*, 560 U.S. 130 (June 14, 2010), the Supreme Court held that "a sentencing

court that misses the 90-day deadline nonetheless retains the power to order restitution—at least

**GOVERNMENT'S SENTENCING MEMORANDUM**                                        **Page 74**

where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount."

Therefore, the government requests the restitution hearing in this case be set out no more than 90 days and consolidated with the restitution hearings for codefendants Porsha Lee and Blancey Lee.  Porsha Lee is currently scheduled to be sentenced on April 15th.  Blancey Lee is scheduled to be sentenced on April 30th.  The Court should schedule a combined restitution hearing anytime during the first two weeks of May and comply with the timelines of the MVRA.

## X.      CONCLUSION

For all the above reasons, the government respectfully asks the Court to sentence defendant Rachel Lee to a prison term of 108 months, followed by a three-year term of supervised release.  The government also asks the Court to set the restitution hearing out to a later date, not to exceed 90 days from the sentencing, to consolidate restitution issues as to all three co-defendants and minimize additional cost and impact to the victim.

Dated this 11th day of February 2015.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

s/ *Donna Brecker Maddux*
s/ *AnneMarie Sgarlata*
DONNA BRECKER MADDUX, OSB #023757
ANNEMARIE SGARLATA, OSB#065061
Assistant United States Attorneys

**GOVERNMENT'S SENTENCING MEMORANDUM**                    **Page 75**